Gary Bendinger (036251)
Alejandro Barrientos (034129)
Katie Derrig (037110)
LEWIS ROCA ROTHGERBER CHRISTIE LLP
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Tel: (602) 262-5311
Fax: (602) 262-5747
gbendinger@lewisroca.com
abarrientos@lewisroca.com
kderrig@lewisroca.com

Justin W. Bernick*
Danielle Desaulniers Stempel*
Michael J. West*
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
justin.bernick@hoganlovells.com
danielle.stempel@hoganlovells.com
michael.west@hoganlovells.com

(*Additional Counsel for Plaintiffs Listed on the Following Page*)

(*Pro hac vice application forthcoming*)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| M.S.E., on her own behalf and on behalf of her minor child, J.M.; <br> M.V.A., on her own behalf and on behalf of her minor child, B.E.; <br> B.C.O., on his own behalf and on behalf of his minor child, M.A.; and <br> U.O.L., on his own behalf and on behalf of his minor child, F.R. <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | Case No.:_____ <br><br> **COMPLAINT** |

1
Dana A. Raphael*
Melissa Giangrande*
2
HOGAN LOVELLS US LLP
Columbia Square
3
555 Thirteenth Street, NW
Washington, DC 20004
4
Tel: (202) 637-5600
Fax: (202) 637-5910
5
dana.raphael@hoganlovells.com
melissa.giangrande@hoganlovells.com
6

7
Cory Szczepanik*
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
8
Denver, CO 80202
Tel: (303) 899-7300
9
Fax: (303) 899-7333
cory.szczepanik@hoganlovells.com
10

11
Mohan Warusha Hennadige*
HOGAN LOVELLS US LLP
390 Madison Avenue
12
New York, NY 10017
Tel: (212) 918-3000
13
Fax: (212) 918-3100
mohan.warusha-hennadige@hoganlovells.com
14

15
Tamara F. Goodlette*
Vanessa Rivas-Bernardy*
REFUGEE AND IMMIGRANT CENTER
16
FOR EDUCATION AND LEGAL SERVICES (RAICES)
1305 N. Flores Street
17
San Antonio, TX 78212
Tel: 210-538-7382
18
tami.goodlette@raicestexas.org
vanessa.rivas@raicestexas.org
19

20
*(*Pro hac vice application forthcoming)*

21

22

23

24

25

26

27

28

## INTRODUCTION

1.      This case seeks damages for harms suffered under an unprecedented policy designed to intentionally and systematically separate asylum-seeking parents from their children at the United States border.  Over the course of several months in 2018, the United States government separated thousands of families.  Those separations caused significant and lasting trauma to both the children and their parents, including Plaintiffs—four parents and their children who were forcibly separated for weeks.

2.      That harm was no accident—it was the government's goal.  Federal officials at the highest levels repeatedly and publicly confirmed that the Family Separation Policy ("the Policy") was designed to inflict trauma in order to deter future asylum seekers from coming to the United States.  Then-Acting Assistant Secretary of the Department of Health and Human Services (HHS) Steven Wagner told reporters that "[w]e expect that the new [separation] policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[1]  Then-Attorney General Jeff Sessions stated that "[w]e need to take away children . . . If [they] care about kids, don't bring them in."[2]  And even after a federal judge enjoined the Policy because separated parents were likely to succeed on their claim that the separations were unconstitutional,[3] President Donald Trump continued to promote the Policy's deterrent purpose, telling reporters that "[i]f they feel there will be separation, they don't come,"[4]

---

[1] Philip Bump, *Here Are the Administration Officials Who Have Said That Family Separation Is Meant as a Deterrent*, Wash. Post (June 19, 2018, 9:14 PM), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent.

[2] Michael D. Shear, Katie Benner & Michael S. Schmidt, *'We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. Times (Oct. 28, 2021), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html.

[3] *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1142-46, 1149 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019).

[4] David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, Reuters (Oct. 13, 2018), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.

and tweeting "if you don't separate, FAR more people will come."[5]

3.      Not content to merely separate parents and their minor children, the government continued to traumatize families by refusing to provide information on their missing family members or to implement adequate measures to ensure reunification.

4.      Plaintiffs' experiences are representative of the thousands of families separated under the Policy.  Each of the four Plaintiff families were detained in unsafe and inhumane conditions, without adequate food, water, bedding, or space to sleep.  They were housed in facilities with inadequate restrooms and forced to go days or weeks without access to clean water.

5.      And each of the four Plaintiff families were separated with no notice, no information, and no plan for reunification.  For weeks, the parents and children were detained separately, sometimes thousands of miles apart.  For weeks, the parents and children begged to be reunited.  And for weeks, the government—due to a combination of ineptitude and cruelty—refused to provide information on their loved ones' whereabouts, wellbeing, or whether they would ever see each other again.

6.      In the end, despite tens of thousands of hours and millions of dollars, the Family Separation Policy failed to deter asylum-seekers from coming to the United States.[6] But it did accomplish one of the Administration's goals: inflicting untold physical, mental, and emotional harm on countless children and parents—including Plaintiffs.  Those harms began with the families' detentions in the notorious "iceboxes" of Yuma County.  But they

---

[5]   Donald Trump (@realdonaldtrump), Twitter (Dec. 16, 2018, 11:25 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363 [https://web.archive.org/web/20190216145802/https://twitter.com/realDonaldTrump/status/1074339834351759363]; *see also* Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, Wash. Post (Apr. 28, 2019), https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.

[6]   U.S. Dep't of Homeland Sec., Off. of Inspector Gen., *OIG-20-06*, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* 34 (2019) [hereinafter *DHS OIG Technology Report*], https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

did not end on the families' release.  Both parents and children continue to suffer today from the long-term toll wrought by their forced separations.

7.     Plaintiffs must live with the trauma of their forced separation, and its lasting effects, for the rest of their lives.  Justice requires redress for their suffering at the hands of the government's unlawful and inhumane policy.  The United States is liable for those harms and should be held accountable under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671 (FTCA).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b).

9.     On May 6, 2020, B.C.O. and M.A.[7] submitted administrative claims to the United States Department of Homeland Security (DHS), United States Customs and Border Protection (CBP), United States Immigration and Customs Enforcement (ICE), United States Citizenship and Immigration Services (USCIS), and HHS.  On May 15, 2020, M.S.E. and J.M. submitted administrative claims to DHS, CBP, ICE, USCIS, and HHS.  On May 22, 2020, U.O.L. and F.R. submitted administrative claims to DHS, CBP, ICE, USCIS, and HHS.  On June 24, 2020, M.V.A. and B.E. submitted administrative claims to DHS, CBP, ICE, USCIS, and HHS.

10.     Because none of the agencies have made a final disposition of Plaintiffs' administrative claims and six months have passed since the submission of Plaintiffs' administrative claims, they are deemed finally denied.  *See* 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all available administrative remedies under the FTCA and may file this action against the federal government.  *See id.*

11.     Because the acts and omissions which are the subject of this Complaint occurred in this District, venue is proper under 28 U.S.C. §§ 1402(b), 1391(e)(1).

---

[7] Plaintiffs are concurrently filing a motion to proceed under pseudonyms.

## PARTIES

12.     Plaintiff M.S.E. resides in Austin, Texas with her minor son, J.M.   When federal officials separated J.M. from his mother, J.M. was fourteen years old.  M.S.E. and J.M. are currently seeking asylum in the United States.  Plaintiff M.S.E. brings this action on her own behalf and, independently, on her son's behalf as his next friend.

13.     Plaintiff M.V.A. resides in Austin, Texas with her minor son, B.E.   When federal officials separated B.E. from his mother, B.E. was fourteen years old.  M.V.A. and B.E. are currently seeking asylum in the United States.  Plaintiff M.V.A. brings this action on her own behalf and, independently, on her son's behalf as his next friend.

14.     Plaintiff B.C.O. resides in Austin, Texas with his minor son, M.A.  When federal officials separated M.A. from his father, M.A. was thirteen years old.  M.A. is currently seeking asylum in the United States.  Plaintiff B.C.O. brings this action on his own behalf and, independently, on his son's behalf as his next friend.

15.     Plaintiff U.O.L. resides in Austin, Texas with his minor son, F.R.  When federal officials separated F.R. from his father, F.R. was six years old.  U.O.L. and F.R. are currently seeking asylum in the United States.  Plaintiff U.O.L. brings this action on his own behalf and, independently, on his son's behalf as his next friend.

16.     Defendant United States of America is the appropriate defendant under the FTCA.  28 U.S.C. §§ 1346(b)(1), 2679(a).

17.     All federal officers and officials referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, ICE, CBP, and HHS.

18.     DHS employees are responsible for separating M.S.E., M.V.A., B.C.O., and U.O.L. from their children.  DHS employees are also responsible for supervising and maintaining detained individuals at CBP and ICE facilities, including the facilities where Plaintiffs were detained before and at the time of separation, and where M.S.E., M.V.A., B.C.O., and U.O.L. were detained during the course of their separations from their children.

19.     HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including the facilities where J.M., B.E., M.A., and F.R. were detained while they were separated from their parents.

20.     Officials from DHS, HHS, and the Department of Justice (DOJ) worked together to design and promulgate the unlawful and unconstitutional Family Separation Policy, pursuant to which Plaintiffs were subjected to significant harm.

21.     All DHS, ICE, CBP, HHS, and other officers referenced in this Complaint who interacted with Plaintiffs were at all relevant times acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

**A.     The Family Separation Policy**

  **1.     The Government Begins Planning A Family Separation Policy With Knowledge Of And Intent To Cause Harm.**

22.     A hallmark of the Trump Administration was its relentless focus on reducing the number of individuals seeking refuge in the United States.[8]

23.     Consistent with that mission, only weeks after inauguration day, John Lafferty, then-Chief of the Asylum Division at USCIS, held an inter-governmental town-hall meeting where he described a new potential policy designed to deter asylum-seekers from migrating to the United States with their children.  The centerpiece of this new policy was separating parents from their children upon arrival at the southern border to intimidate or stop others from exercising their legal right to seek asylum in the United States.[9]  On March 6, 2017, then-DHS Secretary John Kelly confirmed that the Administration was

---

[8] *See, e.g.*, Am. Immigr. Laws. Ass'n, *Tracking Notable Executive Branch Action During the Trump Administration* (May 20, 2022), https://www.aila.org/infonet/tracking-notable-executive-branch-action (listing over 50 proposed and promulgated changes to immigration-related regulations during the last two years of the Trump Administration).

[9] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES.

considering family separation as an immigration deterrent.[10]

24.     That policy would be a radical break from longstanding federal border policy, which prioritized keeping arriving families together.[11]   Nevertheless, the Administration plowed ahead and launched a family separation pilot program in CBP's El Paso Sector in July 2017.[12]

25.     Under this pilot program, the government began to aggressively prosecute parents who crossed the border with children, detain the parents, and forcibly take their children away from them.[13]   After the *government* had separated the children from their parents, it designated the children as "unaccompanied minors" and placed them in the custody of HHS's Office of Refugee Resettlement (ORR).

26.     ORR was not informed of the pilot program or that the children being sent to its custody had, in fact, arrived with parents but were separated from them.[14]   Nor did the government keep track of the families it had separated.[15]   As a result, parents and children

---

[10]   *Kelly: Separating Families under Consideration*, CNN (Mar. 6, 2017), https://www.cnn.com/videos/politics/2017/03/06/trump-travel-ban-separate-parents-children-kelly-tsr-bts.cnn.

[11]   In order to preserve family unity, DOJ had for years generally declined to "refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents." *See* U.S. Dep't of Just., Off. of Inspector Gen., *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 14 (2021) [hereinafter *DOJ OIG Planning Report*], https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf. Similarly, DHS had a longstanding policy of keeping arriving immigrant families intact as their immigration cases were handled by immigration officials. *Id.* at 9 ("At the time, DHS was pursuing such family unit adult cases administratively rather than criminally, consistent with its longstanding policy related to concerns about separating children from parents.").

[12]   *See DHS OIG Technology Report*, *supra* note 6, at 5.

[13]   *Id.* at 2.

[14]   Comm. on the Judiciary, U.S. House of Representatives, *The Trump Administration's Family Separation Policy: Trauma Destruction, and Chaos, Majority Staff Report* 9 (2020) [hereinafter *House Report*] ("Despite the impact on the agency, ORR was not informed of the ongoing pilot program for at least three months after its initiation.") https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519.

[15]   *See* Jacob Soboroff, *Emails Show Trump Admin Had 'No Way to Link' Separated Migrant Children to Parents*, NBC News (May 1, 2019, 7:30 PM) ("'[I]n short, no, we do

1  were detained incommunicado from one another and with no information about one
2  another's location or wellbeing.[16]

3      27.    These "harsh circumstances" were not a bug; they were a feature.  As a
4  Border Patrol official explained in an email advocating for expanding the pilot program,
5  "it is the hope that this separation will act as a deterrent to parents bringing their children
6  into the harsh circumstances that are present when trying to enter the United States
7  illegally."[17]

8      28.    After separating 281 individuals, the pilot program wrapped up in November
9  2017.[18]

10         **2.**      **The Government Launches A Full-Scale Policy Of Forcibly**
11               **Separating Parents From Their Minor Children With Knowing**
             **Intent To Cause Severe Emotional Harm To Deter Future Asylum**
12               **Seekers From Central America.**

13      29.    On December 11, 2017, eight organizations, including RAICES, sent a letter
14  to the DHS Office for Civil Rights and Civil Liberties and the DHS Acting Inspector
15  General urging an investigation into the pilot program and a stop to DHS's "practice of
16  separating families for purposes of punishment and deterrence," emphasizing "the
17  immense trauma created by the separation of family members and the impact of separation
18  on their ability to pursue legal immigration relief."[19]  The letter also raised concerns about
19  

---

20  not have any linkages from parents to [children], save for a handful,' a Health and Human
Services official told a top official at Immigration and Customs Enforcement on June 23,
21  2018.  'We have a list of parent alien numbers but no way to link them to children.' "),
https://www.nbcnews.com/politics/immigration/emails-show-trump-admin-had-no-way-
22  link-separated-migrant-n1000746.

23  [16] *DOJ OIG Planning Report*, *supra* note 11, at 16.

24  [17] *See id.* at 15 n.30 (quoting an e-mail sent on July 28, 2017 to Jim Tierney, the acting
United States Attorney for the District of New Mexico).

25  [18] U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., *OEI-BL-18-00511,*
*Separated Children Placed in Office of Refugee Resettlement Care* 3 (2019),
26  https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf.

27  [19] Letter from Eight Non-Profit Organizations to Cameron Quinn, DHS Officer for Civil
Rights and Liberties, and John Kelly, DHS Acting Inspector General 2 (Dec. 11, 2017),
https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/Family-
28  Separation-Complaint-FINAL-PUBLIC-12-11-17.pdf.

the government's handling of separations, explaining that "DHS and its components continue to lack the ability to track familial relationships of individuals who are transferred to . . . [ICE] custody or to coordinate mechanisms to work with ORR within . . . [HHS] or . . . [DOJ] to facilitate location of, contact with, or release and reunification with separated family members."[20]  As a result, "[f]amily members are given little to no information on what happens to those from whom they are separated, including how to locate, contact, or reunite with them."[21]

30.    Despite these warnings, the government pressed on.  In December 2017, senior officials at DOJ and DHS exchanged a draft memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[22]  The first two policies outlined in the memorandum were titled "Increased Prosecution of Family Unit Parents" and "Separate Family Units."[23]  Under the proposed prosecution policy, "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied alien children]."[24]  According to the memorandum, "the increase in prosecutions would be reported by media and it would have substantial deterrent effect."[25] To be safe, however, the memorandum recommended "public[ly] announc[ing] this policy before implementation."[26]    The second policy option likewise recommended

---

[20] *Id.* at 6.

[21] *Id.*

[22] *Policy Options to Respond to Border Surge of Illegal Immigration* 1 (Dec. 16, 2017), [hereinafter *Policy Options*], https://www.documentcloud.org/documents/5688664-Merkleydocs2.html; *DOJ OIG Planning Report*, *supra* note 11, at 12-14; *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC News (Jan. 17, 2019, 8:40 PM), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targetingmigrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the Office of Senator Jeff Merkley).

[23] *Policy Options*, *supra* note 22.

[24] *Id.*

[25] *Id.*

[26] *Id.*

"[a]nnounc[ing]" that, under the Family Separation Policy, adults would be placed in detention while children would be placed in HHS custody.[27]

31.    On April 6, 2018, then-Attorney General Sessions announced a "zero-tolerance policy" that extended the El Paso family separation pilot program to the entire southern border.[28]   Under the zero-tolerance policy, which came to be known as the "Family Separation Policy," DOJ mandated the criminal prosecution of *all* persons who crossed the United States border, regardless of whether they were seeking asylum or arriving with children.[29]   "On May 4, 2018, with the urging of Sessions," then-DHS Secretary Kirstjen Nielsen signed the DHS policy directing CBP to refer for prosecution adults arriving in family units.[30]   As Sessions explained in a speech on May 7, 2018, "I have put in place a 'zero tolerance' policy for illegal entry on our Southwest border.  If you cross this border unlawfully, then we will prosecute you.  It's that simple."[31]   And if you cross the border with a child, Sessions added, "then we will prosecute you and that child will be separated from you."[32]   The Policy's logic was straightforward: inflict enough harm to discourage migration and deter people from seeking asylum.[33]

32.    The government pretextually justified the Family Separation Policy by emphasizing its "legal obligation to protect the best interests of the child whether that be

---

[27] *Id.*

[28] U.S. Dep't of Just., Off. of Pub. Affs., *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[29] *DOJ OIG Planning Report*, *supra* note 11, at 1.

[30] *Id.*

[31] U.S. Dep't of Just., Off. of Pub. Affs., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[32] *Id.*

[33] President Trump repeatedly acknowledged that the practice of separating families was intended as a "disincentive" for entering the country.  Kindy, et al., *supra* note 5; Shepardson, *supra* note 4 (quoting President Trump's statement that if asylum applicants "feel there will be separation, they don't come").

1 from human smugglings, drug traffickers, or nefarious actors who knowingly break [U.S.]

2 immigration laws and put minor children at risk."[34]  As Nielsen claimed in June 2018:

> DHS is not separating families legitimately seeking asylum at ports of entry.  If an adult enters at a port of entry and claims asylum, they will not face prosecution for illegal entry.  They have not committed a crime by coming to the port of entry . . . We will only separate the family if we cannot determine there is a familial relationship, if the child may be at risk with the parent or legal guardian, or if the parent or legal guardian is referred for prosecution.[35]

7       33.     That, of course, turned out to be false.  As implemented, the Policy resulted

8 in officials separating *all* parents from their children, even if the parents were not criminally

9 prosecuted or in criminal custody.  The government designated *every* family unit adult who

10 crossed the border between ports of entry as amenable for prosecution and separated the

11 adults and children *before* any decision was made whether to actually prosecute.[36]  Because

12 the adults were "amenable to prosecution," the government decided that they were not

---

[34] *See* Maria Sacchetti, *Top Homeland Security Officials Urge Criminal Prosecution of Parents Crossing Border with Children*, Wash. Post (Apr. 26, 2018, 7:58 PM), https://www.washingtonpost.com/local/immigration/top-homeland-security-officials-urge-criminal-prosecution-of-parents-who-cross-border-with-children/2018/04/26/a0bdcee0-4964-11e8-8b5a-3b1697adcc2a_story.html.  Other than the government's Family Separation Policy, there was no basis for removing Plaintiff-Children from Plaintiff-Parents.  And contrary to the government's claim, "no statute or regulation mandat[ed] the separation of [families] upon their entry into the country." *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2020), *motion to certify appeal denied*, No. CV-19-05217-PHX-SRB, 2020 WL 5232560 (D. Ariz. July 6, 2020).  Instead, "[t]he separations were conducted pursuant to executive policy." *Nunez Euceda v. United States*, No. 2:20-cv-10793-VAP-GJSx, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2021); *see also A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020) ("[T]he family separations were conducted pursuant to executive policy, not pursuant to any statute or regulation.").

[35] Kirstjen Nielsen, Secretary, U.S. Dep't of Homeland Sec., White House Press Briefing (June 18, 2018), http://www.whitehouse.gov/briefings-statements/press-briefingpress-secretary-sarah?sanders-department-homeland-security-secretary-kirstjen-nielsen061818/ [https://web.archive.org/web/20180702131044/https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-department-homeland-security-secretary-kirstjen-nielsen-061818/].

[36] *See* Ex. 6, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera*, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 (May 24, 2018 U.S. Border Patrol flow chart showing that family units were separated before the adult went through the criminal or administrative process); *see also* Maria Sacchetti, *Lawyers for Migrants Say U.S. Officials Slowed Family Reunifications*, Wash. Post. (June 8, 2022, 12:07 AM), https://www.washingtonpost.com/nation/2022/06/08/migrant-families-reunifications-delayed/.

"available to provide care and physical custody"[37] to their children, which in turn rendered their children "unaccompanied" and subject to 8 U.S.C. § 1232(b)(3)'s custodial-transfer requirement.[38]

34.    The government never explained how a parent who is merely "amenable" to prosecution—but has not been charged with a crime, prosecuted, or placed in criminal custody—is, for that reason alone, unavailable to care for their child.   Nor did the government explain why CBP continued to separate families even after the U.S. Attorney's Office declined to prosecute the parent—eliminating the only purported justification for the separation.[39]

35.    The government was well aware of the harm that family separation would cause to parents and children.  For example:

a.    In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report concluding that "separation of families for purposes of immigration enforcement or management, or

---

[37] 6 U.S.C § 279(g)(1) (defining "unaccompanied child").

[38] *See* Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera* at 5, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210.  *But see Ms. L.*, 310 F. Supp. 3d at 1139 (explaining that "true 'unaccompanied alien children'" are those who arrive at the border without their parents, not those "detained with their parents at the border and who were thereafter separated from their parents"); *C.M.*, 2020 WL 1698191, at *3 n.4 (rejecting government's argument "that parents who are 'amenable to prosecution' under immigration statutes are 'unavailable to provide care or custody' to their children" requiring the children's transfer to ORR custody); *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 495 n.2 (D.D.C. 2018) (children "rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants. . . are not true unaccompanied minors").

[39] Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera* at 6 n.11, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210 (citing May 10, 2018 email explaining "Yuma Sector has presented [family unit] adults for prosecution but all have been declined" and that "after the declination . . . adults are not being reunited with the children and they have not cancelled the placement requests for the children in the ORR portal," and May 10, 2018 memorandum stating that "Local [ICE Enforcement and Removal Operations] has been advised that once a child has been separated [Yuma Sector] will not try to reunite if prosecution is denied for parent"); *see also C.M.*, 2020 WL 1698191, at *3 ("The United States has cited to no statute explicitly authorizing the government to detain parents and children in separate facilities before it has charged either with a crime.  Indeed, no such statute exists."); *id.* (finding "no statute or regulation requir[ed] the detention of individuals who are 'amenable to prosecution' "); *accord Nunez Euceda*, 2021 WL 4895748, at *4; *A.P.F.*, 492 F. Supp. 3d at 995-996 & n.3.

detention is never in the best interest of children." Far from it, in fact: Separation would have "traumatic and detrimental impact[s]."[40] The Advisory Committee also cautioned that separation is "traumatizing and extremely stressful for the parent who is dealing with the underlying situation but also possible feelings of guilt and worry for their child."[41]   And that is not all.   "[T]hreatening families with separation as means of control or retaliation breaks down the families and erodes the appropriate parent/child relationship.  Families cannot thrive in settings such as these."[42]   As a result, the Advisory Committee cautioned that "[c]hildren should not be separated from their parents in order to continue to detain the adults, or to continue to hold the children by placing them in ORR care."[43]

b.   Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the Policy that separating children from their parents would likely harm the children, including giving rise to "significant potential for traumatic psychological injury to the child."[44]   Other government

---

[40] U.S. Immigr. & Customs Enf't, Dep't Of Homeland Sec., *Rep. of the DHS Advisory Committee on Family Residential Centers* 2, 9-11 (2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[41] *Id.* at 29.

[42] *Id.* at 28-29.

[43] *Id.* at 14.

[44] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE (July 31, 2018, 5:05 PM), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), https://www.congress.gov/event/116th-congress/house-event/108846.

1    officials issued similar warnings.[45]

2    c.   In March 2017, the American Academy of Pediatrics issued a

3         statement warning that the "trauma of" family separation could

4         "exacerbate[]" the "emotional and physical stress children experience

5         as they seek refuge in the United States."[46]

6    d.   Finally, the government was well aware from the pilot program that

7         separating families would cause significant harm.  When ORR staff

8         noticed a more than tenfold increase in the number of separated

9         children entering its care in the summer of 2017, the then-Deputy

10        Director of ORR for the Unaccompanied Alien Children's Program

11        elevated concerns to senior ORR, HHS, CBP, and ICE officials about

12        the traumatizing impact the separations would have on children's

13        wellbeing.[47]  Yet responsible officials failed to take steps to minimize

---

[45] *See* Susan Ferriss, Ctr. for Pub. Integrity, *The Trump Administration Knew Migrant Children Would Suffer from Family Separations. The Government Ramped up the Practice Anyway*, The Texas Tribune (Dec. 16, 2019, 12:00 AM), https://www.texastribune.org/2019/12/16/trump-administration-knew-family-separations-harm-migrant-children/ (recounting examples of internal records warning the government about the harm family separation would cause).

[46] *See* Am. Acad. of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx [https://web.archive.org/web/20170318171325/https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx]; *see also* Letter to John Kelly, Sec'y, Dep't of Homeland Sec. from 184 Organizations 1 (Mar. 22, 2017), https://lulac.org/Family_Separation_Sign_On_Letter_3.22.17_FINAL.pdf    (signatories include the American Academy of Pediatrics, the American Psychological Association, RAICES, Human Rights Watch, Save the Children, and other national, state, and local organizations).

[47] *See* U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., *OEI-BL-18-00510, Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy* 15-16 (2020) [hereinafter *HHS OIG Communication Report*], https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf (reporting that although ORR staff "[a]t several points before the zero-tolerance policy was implemented" communicated with senior officials "that [ORR] lacked the bed capacity to accommodate a large increase in separated children and were also concerned about the trauma such a policy would inflict on children," there was "no evidence" that officials "took action to protect children's interests in response to the information and concerns raised by ORR staff").

the harm that "ORR staff warned was likely and [] ultimately did occur."[48]

36.    These reports and statements are consistent with scientific and medical evidence concluding that separating a child from their parent is extraordinarily harmful and can cause permanent emotional and behavioral problems and brain damage.[49]

37.    But for the government, that harm was the point.  By publicizing the trauma suffered by these families, the Administration hoped to use the Policy to deter others from crossing the border.  Numerous high-ranking officials confirmed as much:

a.    In early 2017, when DHS Secretary Kelly confirmed that the government was considering a family separation policy, he explained, "I would do almost anything to deter the people from Central America from getting on this very, very dangerous network that brings them up through Mexico into the United States."[50]

b.    In August 2017, Gene Hamilton, a former aide to Sessions, instructed DHS officials "to generate paperwork laying out everything we could do to deter immigrants from coming to the U.S. illegally," leading to a memorandum discussing family separation as an option.[51]

---

[48] *Id.* at 17.

[49] *See infra* notes 61-69 and accompanying text.  *See also* Allison Abrams, *Damage of Separating Families: The Psychological Effects on Children*, Psych. Today (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families (reporting that children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress"); *id.* ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Olga Khazan, *Separating Kids From Their Families Can Permanently Damage Their Brains: A Pediatrician Explains How the Trauma of Family Separation Can Change Biology*, The Atlantic (June 22, 2018), https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/ (noting that separating a child from their parents "can permanently affect . . . children's brains, especially if it occurs early in childhood").

[50] *Kelly Says Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 6, 2017, 5:38 PM), https://www.reuters.com/article/us-usa-immigration-children/kelly-says-considering-separating-women-children-at-mexico-border-idUSKBN16D2OX.

[51] Jonathan Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from Their Parents*, New Yorker (May 30, 2018),

c.    On May 11, 2018, Kelly—who, at that point, was serving as President Trump's Chief of Staff—repeated that "a big name of the game is deterrence." He continued that "[t]he children will be taken care of—put into foster care or whatever.  But the big point is they elected to come illegally into the United States and this is a technique that no one hopes will be used extensively or for very long."[52]

d.    On June 18, 2018, in a Fox News interview, Sessions responded to a question about whether the Policy was meant as a deterrent with the answer:  "I see the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration.  So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[53]

e.    And on June 19, 2018, then-Assistant Secretary of HHS Steven Wagner told reporters:  "We expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[54]

38.    Put bluntly, the government made the express choice to intentionally cause parents and children extraordinary pain and suffering in order to accomplish its policy objectives.

---

https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.

[52] *Transcript: White House Chief Of Staff John Kelly's Interview With NPR*, NPR (May, 11, 2018, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[53] *Sessions Defends Zero Tolerance Immigration Policy* (Fox News television broadcast June 18, 2018), https://video.foxnews.com/v/5799065216001/#sp=show-clips.25.

[54] Bump, *supra* note 1.

### 3. The Government Applies The Policy In A Deliberately Inhumane Manner To Cause Further Harm To Families.

39. The mere fact of being forcibly separated from one's child or parent—potentially indefinitely, under such coercive circumstances, without knowledge of their wellbeing—is cruel enough. But officers did not stop there. Guided by the Family Separation Policy, officers subjected detained families to increasingly inhumane and unsafe conditions, deprived them of adequate food, adequate bedding, and sufficient space to sleep. Children and adults were packed into metal "cages" where overhead lighting "stay[ed] on around the clock."[55] Many were initially detained in facilities so cold they were nicknamed "iceboxes." Despite the frigid temperatures in these facilities, officers often gave migrants only thin aluminum blankets.[56] Officers often refused to give migrants clean drinking water, forcing migrants to drink foul-smelling and -tasting water from taps next to toilets. There were inadequate restroom facilities, and many families went days or weeks without access to clean water, showers, soap, or toothpaste.[57] As one District Judge observed, "the government actors responsible for the 'care and custody' of migrant children have, in fact, become their persecutors."[58]

40. Parents waited and watched in terror as children were taken away, fearing that they were next. Immigration officials often separated children in front of their parents, forcing parents to watch as their children were led away—with no idea of where their children were going, how long they would be apart, or whether they would ever be reunited. Sometimes, "the children were taken away under the pretense that they would be getting a

---

[55] Nomaan Merchant, *Hundreds of Children Wait In Border Patrol Facility In Texas*, AP News (June 18, 2018), https://apnews.com/article/north-america-tx-state-wire-us-news-ap-top-news-border-patrols-9794de32d39d4c6f89fbefaea3780769.

[56] Mariana Alfaro, *Migrants Detained at the Border are Kept In Freezing Cells Nicknamed 'Iceboxes' — Here's What We Know about Them*, Bus. Insider (Dec. 27, 2018, 2:05 PM), https://www.businessinsider.com/migrants-detained-at-border-kept-in-freezing-cells-nicknamed-iceboxes-2018-12; Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018), https://www.hrw.org/sites/default/files/report_pdf/uscrd0218_web.pdf.

[57] *See* Human Rights Watch, *supra* note 56, at 16-19.

[58] *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1166 (S.D. Cal. 2018).

bath."[59]   Other times, officials removed parents to another room and took their children away in their absence, depriving families of any opportunity to say goodbye.[60]

41.   The very fact of separation caused physical, mental, and emotional harm to parents and children.  This trauma is well-documented.  For example:

    a.   The HHS Office of the Inspector General acknowledged in a report that "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated."[61]

    b.   Numerous agency officials also filed reports confirming the negative effects on health, wellbeing, and safety caused by family separation, characterizing this as "abuse while in Government custody."[62]   For example, one report noted that a separated child was "tearful" and "would not speak or engage in conversation with anyone."[63]   Another described a child who "developed suicidal ideations while detained after" being separated from his family.[64]

---

[59] Camila Domonoske & Richard Gonzales, *What We Know: Family Separation And 'Zero Tolerance' at the Border*, NPR (June 19, 2018, 2:17 PM), https://www.npr.org/2018/06/19/621065383/what-we-know-family-separation-and-zero-tolerance-at-the-border.

[60] *See, e.g.*, Physicians for Human Rights, *"Part of My Heart Was Torn Away": What the U.S. Government Owes the Tortured Survivors of Family Separation* 16-17 (2022), https://phr.org/wp-content/uploads/2022/04/PHR_-Report_Deported-Parents_2022.pdf.

[61] U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., *OEI-09-18-00431, Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 10 (2019) [hereinafter *HHS OIG Care Provider Report*], https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

[62] Am. Immigr. Council, *Government Documents on Family Separation, Tracking the Policy's Evolution, Implementation, and Harm*, https://www.americanimmigrationcouncil.org/FOIA/government-documents-family-separation-tracking-policys-evolution-implementation-and-harm#toc-title-id-2 (last visited July 11 , 2022).

[63] *Id.*

[64] *Id.*

c.     A Physicians for Human Rights investigation based on psychological evaluations of families separated under the Policy similarly "found pervasive symptoms and behaviors consistent with trauma; most met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation."[65]   That trauma would also likely cause "an increased risk of psychiatric disorders such as anxiety, depression, and psychosis, and of detrimental coping behaviors such as smoking and the use of alcohol or drugs."[66]   The investigation ultimately concluded that the Family Separation Policy "constitute[d] cruel, inhuman, and degrading treatment" akin to "torture."[67]

42.     These harms can and do persist even after the eventual reunification with a parent or other family.[68]   Indeed, doctors have concluded that many of the children that the government separated from their parents will be seriously impaired for the rest of their lives[69] and experience "heightened feelings of anxiety and loss as a result of their

---

[65] Physicians for Human Rights, *"You Will Never See Your Child Again," The Persistent Psychological Effects of Family Separation* 3 (2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf.

[66] *Id.* at 24.

[67] *Id.* at 5.

[68] *Nolasco*, 319 F. Supp. 3d at 503 (noting "[t]he psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation – even after the eventual reunification with a parent or other family") (citing Julie M. Linton, Marsha Griffin, Alan J. Shapiro, & Council on Cmty. Pediatrics, Am. Acad. Of Pediatrics Pol'y Statement, *Detention of Immigrant Children*, 139 Pediatrics 1 (2017)).

[69] *Hearing on "Examining the Failures of the Trump Administration's Inhumane Family Separation Policy" Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 116th Cong. 3 (2019) (testimony of Dr. Jack P. Shonkoff, M.D., Professor of Child Health & Dev. at the Harvard Chan Sch. of Pub. Health & the Graduate Sch. of Educ. and Professor of Pediatrics at Harvard Med. Sch.), https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Shonkoff%20testimony%20FINAL_0.pdf.

1   unexpected separation from their parents after their arrival in the United States."[70]

2   43.   Compounding this trauma, parents and children were often not told for weeks

3   where the other was located or when they would be reunited.  Officials failed to provide

4   parents and children, including Plaintiffs, with any information regarding each other's

5   whereabouts or wellbeing,[71] which "added to the distress and mental health needs of

6   separated children."[72]   Nor did officers "provide for ready communication between

7   separated parents and children."[73]  These failures "also contributed to children's anxiety

8   and fear for their well-being."[74]

9   44.   According to Plaintiffs, officials instead told parents to forget about their

10  children.  They also threatened the children, telling them that if they did not behave, they

11  might remain in detention longer without their parents.

12  45.   Officials' failure to tell parents where their children were, and *vice versa*, is

13  not surprising:  The government implemented the Policy knowing full well it had no system

14  in place to adequately track and reunify separated families.[75]  CBP and ORR, which

15  received custody of separated children from DHS, did not systematically track children

16  after they were separated from their parents.[76]  The government's failures resulted in delays

17

---

18  [70] *HHS OIG Care Provider Report*, *supra* note 61, at 10 ("Children who did not understand
19  why they were separated from their parents suffered elevated levels of mental distress.  For
    example, program directors and mental health clinicians reported that children who
20  believed their parents had abandoned them were angry and confused.").

    [71] Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids*,
21  Wash. Post, (June 21, 2018, 8:26 PM) (reporting that "government authorities have often
    been unwilling to arrange phone calls between [separated parents and children], or provide
22  details about where the child is held"), https://www.washingtonpost.com/world/
    the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-
23  kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html.

24  [72] *See, e.g.*, *HHS OIG Care Provider Report*, *supra* note 61, at 11.

    [73] *See Ms. L.*, 310 F. Supp. 3d at 1137.

25  [74] *HHS OIG Care Provider Report*, *supra* note 61, at 10-11.

26  [75] *See generally DOJ OIG Planning Report*, *supra* note 11, at 13-17; *House Report*, *supra*
    note 14, at 3 (discussing emails in December 2017 from HHS inquiring why children
27  arriving in their custody were claiming to have been separated from parents).

    [76] *See generally DHS OIG Technology Report*, *supra* note 6; *Ms. L.*, 310 F. Supp. 3d at
28  1144.

in parents' ability to locate and communicate with their children, and ultimately to be reunited, causing even more anguish for separated families.

46.    The government's mandatory policy of separating parents from their children and the manner in which it was implemented violated the constitutional right to family integrity of the persons subject to the Policy, including Plaintiffs.

### 4.    The Government Initiates A Haphazard Reunification Process After Being Ordered To End The Family Separation Policy.

47.    The public backlash against the Family Separation Policy was swift and vociferous.[77]   In response, the government initially tried to backtrack and "vehemently denied" the Policy's existence.[78]

48.    The public was not convinced.  In the face of continued outrage, and after forcibly separating thousands of families at the border over the course of more than two months, President Trump signed an Executive Order on June 20, 2018 purporting to address the situation.  The Executive Order proclaimed that it was the Administration's

---

[77] *See, e.g.*, Joel Rose & Marisa Peñaloza, *Protesters Across The U.S. Decry Policy of Separating Immigrant Families*, NPR (June 1, 2018, 5:05 PM), https://www.npr.org/2018/06/01/616257822/immigration-rights-activists-protest-trump-administration-child-separation-polic; Laura Bush, Opinion, *Separating Children from Their Parents at the Border 'Breaks my Heart'*, Wash. Post (June 17, 2018, 8:45 PM), https://www.washingtonpost.com/opinions/laura-bush-separating-children-from-their-parents-at-the-border-breaks-my-heart/2018/06/17/f2df517a-7287-11e8-9780-b1dd6a09b549_story.html ("[T]his zero-tolerance policy is cruel.  It is immoral.  And it breaks my heart."); David Smith & Tom Phillips, *Child Separations: Trump Faces Extreme Backlash from Public and His Own Party*, The Guardian (June 19, 2018), https://www.theguardian.com/us-news/2018/jun/19/child-separation-camps-trump-border-policy-backlash-republicans;  Alexandra  Yoon-Hendricks  &  Zoe  Greenberg, *Protests Across U.S. Call for End to Migrant Family Separations*, N.Y. Times (June 30, 2018),            https://www.nytimes.com/2018/06/30/us/politics/trump-protests-family-separation.html.

[78] *See* Christina Wilkie, *White House Denies Separating Families Is 'Policy,' but Insists It Is Needed 'to Protect Children'*, CNBC (June 18, 2018, 6:26 PM), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *see also The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Sec.*, 116th Cong. 46-48 (Mar. 6, 2019) (statement of Sec'y Kirstjen Nielsen, Dep't of Homeland Sec.).

policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."[79]

49.     The Executive Order refused to acknowledge the Family Separation Policy's existence, or that the Order represented a course-change from the status quo.  Perhaps as a result, the Executive Order also did not address how the government planned to reunite the thousands of children and parents who had been forcibly separated.

50.     Although officials publicly stated that the system was "unprepared" to quickly reunite families, federal officials actively tried in early May 2018, if not before, to *prevent* reunification because of concerns that reuniting families "too quickly" would undermine the Policy's goal of intimidating families.[80]

51.     Migrants who are prosecuted for crossing the border illegally are typically processed, arraigned, charged, and sentenced within a couple of hours in federal court and sentenced to time served.  Because ORR generally required more time to process and pick up children designated as unaccompanied from DHS custody, ORR was regularly refusing to accept children designated as unaccompanied based on a parent's criminal prosecution because their parents had returned from court and the children were no longer unaccompanied.  As a result, top ICE officials feared "a situation in which the parents are back in the exact same facility as their children . . . who have yet to be placed into ORR custody" and urged ICE to work with CBP "to prevent this from happening."[81]

52.     These concerns reached a "fever pitch" in May 2018 when senior ICE officials reported that CBP was "reuniting adults with kids" at the busiest stretch of the southern border.[82]  "We can't have this," one ICE official warned, arguing that "ORR needs

---

[79] Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13,841, 83 Fed. Reg. 29,435 § 1 (June 20, 2018).

[80] Sacchetti, *supra* note 36.

[81] *Id.*

[82] *Id.*

1    [its] arm twisted."[83]    Another referred to reuniting unlawfully separated parents and

2    children as "a fiasco."[84]

3        53.    In response, a CBP official instructed Border Patrol agents to "cease the

4    reunification process" in border stations.    The next day, a top ICE official messaged the

5    CBP Commissioner, his deputy, and the acting ICE director about ORR's refusal to take

6    children whose parents had returned from court, stating:  "This obviously undermines the

7    entire effort and the Dept is going to look completely ridiculous if we go through the effort

8    of prosecuting only to send them to a FRC (family residential center) and out the door."[85]

9        54.    As of June 22, 2018, the government still had "no procedure in place for the

10    reunification of [separated] families."[86]

11        55.    On June 26, 2018, the Honorable Dana M. Sabraw of the Southern District

12    of California held in *Ms. L.* that the Family Separation Policy—which disproportionally

13    impacted individuals from Central America, including Plaintiffs—and the manner in which

14    it    was    implemented,    likely    violated    separated    families'    constitutional    rights.[87]

15    _____

[83] *Id.*

16    [84] *Id.*

17    [85] *Id.*

18    [86] *Ms. L.*, 310 F. Supp. 3d at 1140-41.  Even after *Ms. L.* ordered the government to end the Family Separation Policy, the government continued to separate thousands of families.

19    *See* John Washington, *The Government Has Taken at Least 1,100 Children from Their Parents Since Family Separations Officially Ended*, The Intercept (Dec. 9, 2019, 10:56

20    AM), https://theintercept.com/2019/12/09/family-separation-policy-lawsuit/.

[87] *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the

21    merits of their substantive due process claim).  The liberty interest identified in the Fifth Amendment provides a right to family integrity and familial association.  That right was

22    "well established" even before it was recognized in *Ms. L.  See Quillon v. Walcott*, 434 U.S. 246, 255 (1978) (stating "the relationship between parent and child is constitutionally

23    protected"); *see also Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well

24    established.").  As *Ms. L.* and several other courts have recognized, separating families threatens that right.  *See Ms. L.*, 302 F. Supp. 3d at 1161-67 (finding plaintiffs stated a

25    legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the

26    government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing

27    that they were unfit parents or otherwise presented a danger to their children); *see also C.M.*, 2020 WL 1698191, at *4 ("Plaintiffs have plausibly alleged that the government's

28    separation of their families violated their constitutional rights, which is not shielded by the

Accordingly, Judge Sabraw issued a class-wide preliminary injunction prohibiting DHS from separating families, subject to certain exceptions, and ordering the government to reunify families.[88]

56.   Only after Judge Sabraw issued the injunction did the government begin to reunify families.[89]   But because HHS and DHS "did not routinely collect and share the information necessary to identify, track, or connect families separated by DHS,"[90] reunification was chaotic, to say the least.[91]

57.   Reuniting thousands of children and parents would have been difficult no matter the circumstances, but the government's failure to track separated parents and children compounded the difficulties.   Many children were even "lost in the system" with

---

discretionary function exception."); *A.P.F.*, 492 F. Supp. 3d at 996 (finding "the government's practice of separating families, and the procedures used to implement this practice, likely violated due process"); *Nunez Eucedo*, 2021 WL 4895748, at *3 (same); *Nolasco*, 319 F. Supp. 3d at 502 (a family involuntarily separated after crossing the border "likely w[ould] succeed on their substantive due process claim premised on their constitutional right to family integrity"); *J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018) (even the government "agree[d] that a constitutional violation occurred when the government separated children from their parents").

[88] *Ms. L.*, 310 F. Supp. 3d at 1140, 1141-46.  The injunction, among other things, prohibited the government from separating parents from their minor children in the future absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within 14 days, and to reunify parents separated from children aged five and older within 30 days. *Id.* at 1149-50. Each of the Plaintiff-Parents in this Complaint is a member of the class in *Ms. L.  See id.* at 1139 n.5 (defining parent class).

[89] U.S. Dep't of Homeland Sec., Off. of Inspector Gen., *OIG-18-84, Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 10 (Sep. 27, 2018) [hereinafter *DHS OIG Highlights*], https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

[90] *HHS OIG Communication Report*, *supra* note 47, at 6.

[91] Caitlin Dickerson, *Trump Administration in Chaotic Scramble to Reunify Migrant Families*, N.Y. Times (July 5, 2018), https://www.nytimes.com/2018/07/05/us/migrant-children-chaos-family-separation.html; Sieff, *supra* note 71.

no information on where they entered the country, when, or with whom.[92]   And some remain lost today.[93]

58.    The lack of preparation is indefensible on its own, but it is particularly appalling given that the government was on notice of the need to prepare.  After the pilot program of separating families had concluded, CBP and ORR notified other parts of the government of the very deficiencies that eventually plagued the Policy's implementation.[94]  Despite these warnings, the government turned a blind eye to the obvious need for critical officer training, a system for tracking families, and a plan for eventual reunification, exhibiting a deliberate and utter indifference to human suffering generally, and the suffering of vulnerable migrants in its custody specifically.

59.    Judge Sabraw found these failures "startling."[95]   As he explained, the government routinely keeps track of "personal property of detainees in criminal and immigration proceedings," including "[m]oney, important documents, and automobiles, to name a few."[96]  "Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*."[97]

---

[92] *DHS OIG Highlights*, *supra* note 89, at 10; *see, e.g.*, Ed Pilkington, *Parents of 545 Children Still Not Found Three Years after Trump Separation Policy*, The Guardian (Oct. 21, 2020), https://www.theguardian.com/us-news/2020/oct/21/trump-separation-policy-545-children-parents-still-not-found.

[93] Aline Barros, *Five Years Later, Work of Reuniting Families Separated at US-Mexico Border Remains Unfinished* (June 11, 2022), https://www.voanews.com/a/five-years-later-work-of-reuniting-families-separated-at-us-mexico-border-remains-unfinished/6610677.html.

[94] *DHS OIG Technology Report*, *supra* note 6, at 14-15, 17-24.

[95] *Ms. L.*, 310 F. Supp. 3d at 1144.

[96] *Id.*

[97] *Id.*; *see also C.M.*, 2020 WL 1698191, at *2 ("Federal immigration officials . . . are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care.").

60.     In the end, the government's efforts to implement an unconstitutional policy that would intentionally inflict emotional distress on parents and children succeeded.  Even the government has acknowledged the profound negative impacts of the Family Separation Policy.[98]     Thousands of families—including Plaintiffs—are still living with these devastating consequences today.

**B.     M.S.E. and J.M.**

**1.     The Two-Month Separation of M.S.E. and J.M.**

61.     On May 18, 2018, Plaintiff-Parent M.S.E. and her fourteen-year-old son J.M. entered the United States near Yuma, Arizona, and turned themselves in to CBP officers. Upon apprehension, M.S.E. tried to explain that her reason for coming to the United States from Mazatenango, Guatemala, was to escape persecution and seek asylum.   But the officers, who spoke little Spanish and did not provide an interpreter, accused M.S.E. of lying and yelled at her to sign deportation papers, stating that asylum-seekers frequently lie about their reasons for coming to the United States.   They also told her she had committed a crime by crossing the border and questioned whether J.M. was really her son.

62.     The officers took M.S.E. and J.M. to the Yuma Border Patrol Station, one of many short-term detention centers often referred to as a "*hielera*" or "icebox."[99]   M.S.E. and J.M. were put into cells packed with dozens of other people; they could not move without touching someone else.   They were given no water to drink and had to resort to water from a faucet next to the toilet in the cell.   For food, they were only given cold soup to eat.   Despite frigid temperatures, they were given only an aluminum blanket that did not keep them warm.   They were given no change of clothes and had no ability to bathe.   M.S.E. recalls others in the cell being called out at all times of day or night by officers but, throughout their detention, no one explained to them what was happening.

63.     J.M. recalls that officers yelled at him while taking his fingerprints at the Border Patrol Station.   They appeared frustrated that the system would not register his

---

[98] *See generally HHS OIG Care Provider Report*, *supra* note 61.

[99] *See* Alfaro, *supra* note 56.

prints because his hands and fingers were scraped and wounded from his journey to the United States.  They shouted instructions at him in English and aggressively grabbed his hands and fingers, forcefully holding them in place.  J.M., who did not understand what they were saying or what he was being asked to do, was terrified.

64.     At some point, officers met with M.S.E. and made her sign a document she did not understand.  No one translated the paperwork into Spanish for her.  Refusing to explain its contents, the officers simply told M.S.E. that she would be deported and that her son would remain in the United States.  When she told them that she wanted to take her son with her, the officers told her the decision was not hers to make.  Out of desperation, M.S.E. signed the papers.

65.     M.S.E. and J.M. remained together only two days before the government forcibly separated them on May 20, 2018.  Guards came to the cell and called out for J.M. and approximately five other children.  M.S.E. begged the officers to allow her to go with them, but they rejected her pleas.  M.S.E. expected J.M. to return—but he never did.

66.     The officers told J.M. and the other children that they would be transferred to a new facility, and instructed them to bathe, change their clothes, and get in line.  At this point, M.S.E. and the other mothers could see the children through the cell door.  M.S.E. and J.M. were too far from one another to speak, so J.M. waved goodbye to his mother as the officers led him and the other children out of the facility.  M.S.E. and the other mothers were left crying in their cell—with no explanation for why their children were being taken away, where they were going, or how long they would be apart.

67.     M.S.E. repeatedly asked the officers about J.M., but they never explained what happened to J.M.  Instead, the officers said M.S.E. and the other parents would be deported and their children would be put up for adoption.  They told M.S.E. to forget about her son.

68.     J.M. and the other children were led from the facility to a bus, which brought them to a plane.  J.M. did not know where he was going, and the officers did not explain.

69. After being separated from his mother, J.M. was processed as an unaccompanied minor. This happened notwithstanding CBP's knowledge that J.M. entered the United States with his mother.

70. DHS transferred J.M. to a shelter for unaccompanied children in Brownsville, Texas. Unbeknownst to either J.M. or M.S.E., CBP officials misspelled J.M.'s name, which made it impossible for M.S.E. to locate him on her own.

71. During his separation, J.M. repeatedly asked to talk to his mother. His caseworker repeatedly answered that she did not know where his mother was. Although many other children were in contact with their parents and some left the shelter after only a few weeks, J.M. was unable to speak to M.S.E. for approximately two months. Watching other children contact their parents and come and go at the shelter made J.M. distraught.

72. Having been transferred to multiple facilities throughout the separation, M.S.E. does not remember exactly where she was detained or the sequence of detention locations. She recalls, however, being transferred to yet another facility shortly after she was separated from her son.

73. For at least the first few weeks of M.S.E.'s detention, she was given no opportunity to bathe. In the first several detention centers, she was placed in crowded cells with other migrant women. They were given no water, and forced to drink water from the taps next to the toilets. They were given only one dry cup of ramen noodles per day, necessitating a daily trip to the toilet-adjacent taps—which only provided cold water—to make the food somewhat edible. In some facilities, she and other detainees were given aluminum blankets, but officers refused to replace them if they ripped or were stolen. In at least one facility, M.S.E. and other detainees did not even get aluminum blankets to cover themselves at night. During these first few weeks, she only spent one night in a bed.

74. During this time, officers repeatedly told M.S.E. and other parents that they would be deported and that their children would be put up for adoption. One officer threatened M.S.E. that she would never see her son again. M.S.E.—who remained

confused and worried about J.M.—often cried out of fear.  This was the first time M.S.E. had ever been apart from J.M.; she was distraught.

75.     After more than three weeks of being detained in these horrid conditions, M.S.E. was handcuffed and placed on an airplane without explanation.  She feared that she was being deported, but she was in fact being transferred to another detention facility.

76.     At some point, M.S.E. was again transferred to another facility—this time in Aurora, Colorado.  While there, M.S.E. was forced to strip naked—removing even her underwear.  M.S.E. was, and continues to be, scarred by this humiliating experience.

77.     As a result of the conditions of her confinement, M.S.E. fainted twice due to anxiety and distress.  She witnessed other women fainting as well.  M.S.E. hid her fainting spells from the guards, however, fearing that the government would prolong her detention if she complained or sought out medical assistance.

78.     When M.S.E. asked for information about her son, officers gave her a list of phone numbers and told her to call the numbers to try to find him.  She did not have adequate telephone access, and in the rare moments she did, she was not able to locate J.M. by calling the shelters because—unbeknownst to M.S.E. at the time—immigration officials had misspelled J.M.'s name when processing him.

79.     About a month into the separation, M.S.E. still had not spoken to her son, nor did she know where he was.  But she had heard from other women that a child had died in a United States detention center, exacerbating the fear and anxiety she felt daily for J.M.'s wellbeing.

### 2.     Reunification

80.     On or about July 20, 2018, shelter workers told J.M. that he would be reunited with his mother the next day.  J.M. was so eager to see his mother that he could not sleep all night.  The next day, however, officers gave J.M. conflicting information about whether he would or would not see his mother that day.  The day passed, and J.M. did not see his mother.

81.    On or about July 21, 2018, officers came to M.S.E.'s cell and called for her. They restrained her hands and feet and put her on a plane.  M.S.E. again believed and feared that she was being sent back to Guatemala without J.M.  But, again, she was taken to a new detention center.

82.    On or about July 22, 2018, officers brought J.M. to a detention center and led him into a room where he finally saw his mother.  The officers asked M.S.E. if she recognized J.M.  It was only then that M.S.E. realized they had recorded J.M.'s name incorrectly.

83.    M.S.E. and J.M. were overjoyed to see each other again after two months apart.  Mother and son ran to each other, hugged each other, and sobbed.  J.M. noticed that M.S.E. looked strikingly different to him: her eyes were swollen, she was very skinny, and she appeared depressed.

### 3.    Harms and Losses

84.    As a direct result of the United States government's actions, Plaintiffs suffered, and continue to suffer, significant physical and emotional harm.

85.    Prior to their forced separation, M.S.E. and J.M. had never been apart. During their separation, M.S.E. spent two months in a state of constant uncertainty and fear about her son.  J.M. often felt helpless, sad, and confused during the separation.

86.    M.S.E. was not sick when she left Guatemala, but she became ill in detention. The separation, coupled with the conditions of confinement to which DHS subjected her, caused M.S.E. to faint twice from the constant anxiety and distress.  M.S.E. was told by other detainees that migrants who complain about being sick ended up detained for a long time, so she took great pains to hide her fainting spells from the officers and never asked to see a doctor.  M.S.E. remained extremely fearful throughout her time in detention about what would happen if the officers found out she was ill, whether she would be deported without J.M., and what had happened to her son.  She was distraught at not knowing what had happened to her son and believes the stress manifested in health issues that persist to this day.

29

87.     M.S.E. and J.M. continue to suffer the physical and psychological impact of their separation today.  M.S.E. lost all energy and motivation, recalling that she just wanted to lie down all the time upon her release.  When she was finally able to see a doctor through a local low-income health coverage plan, M.S.E. learned that she had developed diabetes and high blood pressure following the separation.  She now has to take pills daily and check her blood and sugar levels three times per day.  M.S.E. also suffers from depression.

88.     The experience also changed J.M.  After their reunification, M.S.E. noticed how profoundly her son had changed over the time they had been separated.  J.M. had developed severe chest pains and breathing problems during the separation, and M.S.E. observed how he could only walk a short distance before running out of breath.  He also no longer carried himself like a child at all.  He was withdrawn and his expressions were very sad for a long time.  He even began cutting himself, which made M.S.E. frantic.  Desperate, she went to J.M.'s school and sought his school counselor's help.

89.     J.M. still hurts from the separation.  He still remembers it vividly and viscerally: he feels great pain in his chest and throat when he thinks about it.  Now nineteen years old, J.M. continues to struggle with the damage the separation caused, stating, "I'm big now so I try to be strong.  But I still feel broken inside."

C.     **M.V.A. and B.E.**

1.     **The One-Month Separation of M.V.A. and B.E.**

90.     On June 17, 2018, Plaintiff-Parent M.V.A. and her fourteen-year-old son B.E. entered the United States near the San Luis, Arizona Port of Entry.  M.V.A. fell off the border wall while crossing and badly injured her ankle.  M.V.A. and B.E. waited by the wall until CBP officers arrived about an hour later and M.V.A. and B.E. turned themselves in.  Officers told M.V.A. and B.E., who fled Guatemala to escape persecution, that it was a crime to cross the border without authorization.  During this time, M.V.A. told the officers that she was B.E.'s mother.

91.     Officers handcuffed M.V.A. and brought her and B.E. to the Yuma Border Station, a.k.a. the "icebox."  There, mother and son were separated and placed in different

filthy and overcrowded cells.  B.E. cried uncontrollably as this happened, and M.V.A. could not bear the sight.  Despite the frigid temperatures, they did not have any real blankets during their time there—only an aluminum sheet, which B.E. recalls barely covered them and did not keep them warm at all.  Separated from his mother, B.E. felt unsafe and deeply feared the officers, who spoke only in English.

92.    The cell M.V.A. was detained in was so small and overcrowded that the women had to remain sitting up when sleeping.  There was only one toilet, and no soap with which to wash their hands.  M.V.A. and the other women were only given cold ramen noodles to eat.  They were given no drinking water.  They instead had to drink water from the cell's faucet.  The water from the faucet smelled and tasted so foul that M.V.A. recalls she and the other women tried to go as long as they could without water.  One time, an officer—seemingly deliberately—chugged a bottle of water in front of them.  When M.V.A. and the other women asked for clean water, the officer said the water bottles were only for the officers, not migrants.  Initially, M.V.A. could see her son B.E. in his cell when she stood at the door of her cell; B.E. could also see his mom through the window and would wave to her.

93.    The night after they arrived in the United States, or around that time—and unbeknownst to M.V.A.—officers called B.E.'s name and led him to a bathroom.  There, the officers instructed B.E. to bathe and change into ill-fitting clothes.  The officers then told B.E. that they were taking him to a shelter in New York.  DHS processed B.E. as an unaccompanied minor, even though he had been apprehended with his mother, and sent him to a shelter for unaccompanied children in Yonkers, New York.

94.    M.V.A. did not initially know that the government had taken her son from Arizona to New York.  Her first hint that her son was no longer in the Border Station was when she looked for him from her cell and could no longer see him.  She asked and pleaded with multiple officers to tell her where B.E. had gone, but they told her to forget about her son.  After four days of begging for information about her son, the officers told her that B.E. was gone, but gave no indication where he had been taken or how long he would

31

remain there.  M.V.A. asked every officer, every day, at every opportunity she could about B.E. and where he was.  No one gave her any information.

95.     Soon after M.V.A. found out that the government had taken her son away from her, she began to experience extreme pain in her molar, blurry vision, lightheadedness, nausea, fever, and an ear infection.

96.     On or about July 4, 2018, the government transferred M.V.A. to a facility in Florence, Arizona.  During her time there, she suffered from depression and anxiety, and became increasingly sick.  When M.V.A. asked for medical help, officials did not respond immediately and instead told her to wait for her turn.  When she finally saw the doctor, the doctor did not conduct a full medical exam and gave her only acetaminophen.  The doctor spoke mostly, if not only, English, so M.V.A. was unable to communicate with the doctor.

97.     M.V.A. was transferred to several other detention centers during her separation from B.E.  Each time, she was fingerprinted, forced to undress completely, and subjected to a nonconsensual vaginal exam.  The experience humiliated M.V.A.

98.     While in detention, officers also tried to force M.V.A. to sign a bond for $14,000.  When she told them she had no money, officers told her to either pay the $14,000 or suffer deportation.  She refused to sign and was eventually returned to her room.

99.     Meanwhile, at the Yonkers shelter, officers told B.E. that the government was going to be in charge of him from then on and that they were going to deport his mother.  Shelter staff told B.E. that they would only reunite him with his mother if he behaved well and that, if he behaved badly, he would have to stay longer at the shelter. B.E. was so distraught and frightened that he felt nauseated and stopped eating.  After four days of nausea and eating very little, he had to be taken to the hospital.

100.     B.E. struggled to adapt to life in the shelter.  He was bullied and had several physical altercations with other children.  B.E. reported these concerns to shelter staff, but the problems persisted.

101.     At one point, shelter staff instructed B.E.—a child confined to a shelter—to look for someone to stay with in the United States.  On or about June 20, 2018, a case

manager assigned to B.E. met with him to discuss possible sponsors in the United States. B.E. told the case manager that he had arrived with his mother and that they were separated at the border.  After learning this, the case manager filed a Significant Incident Report[100] noting that he had searched for M.V.A. using the ICE detainee locator but no results turned up.

102.    During this encounter, B.E. also identified a family friend in Texas as a potential sponsor.  The next day, the case manager called and asked the family friend to sponsor B.E.  The family friend expressed that he would only sponsor B.E. if his mother was with him.  The case manager explained that he currently had custody of only B.E. and that his mother's location was unknown.  The case manager asked the family friend for M.V.A.'s phone number to try to locate her.  The family friend stated that he would try and find M.V.A.'s phone number.

103.    The case manager spoke with the family friend again on June 22, 2018.  The family friend reiterated that he would only sponsor B.E. if his mother was with him.  The case manager repeated that he could not guarantee that M.V.A. and B.E. would be reunited because M.V.A.'s location remained unknown.  Because the case manager was not able to locate M.V.A. in ICE's system, he instead asked the family friend for her date of birth or contact information.  The family friend did not know her date of birth but shared a phone number at which M.V.A. might be reached.  When the case manager dialed the phone number, however, the call dropped every time.

104.    A few days later, on or about June 26, 2018, B.E.'s case manager again attempted to locate M.V.A. by calling a detention officer in Santa Cruz County.  The officer informed him that he could not share any information about M.V.A. and advised him to

---

[100] ORR staff use Significant Incident Reports to document and communicate events "affecting an unaccompanied child's (UC) safety and well-being" "for ORR's immediate awareness."  *See* ORR, *Children Entering the United States Unaccompanied: Section 5* at Section 5.8 (June 7, 2021), https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied-section-5.

instead contact a Human Resources number.  The case manager called the number, but no one answered.

105.    M.V.A. did not receive any information about B.E. until about three weeks after their separation, when she received a phone call from B.E.'s case manager who told M.V.A., to her shock, that B.E. was in New York.  She and B.E. were able to speak for only a few minutes and both cried heavily during the call.

### 2.    Reunification

106.    On or about July 19, 2018, almost a month after being separated, shelter staff met with B.E. and explained to him that he would soon be reunited with his mother.  B.E. almost cried from happiness and eagerly waited to see his mother.

107.    On or about July 20, 2018, B.E. was taken from the shelter and put on a plane. Officials did not tell B.E. where he was going.  He landed in Arizona and was taken to a detention center, where he was reunited with his mother.  To B.E., his mother looked happy to see him, but also sick.  B.E. thinks she was sick from the sadness.  M.V.A. and B.E. were released on or about July 20, 2018.

### 3.    Harms and Losses

108.    As a direct result of the government's actions, M.V.A. and B.E. suffered, and continue to suffer, significant physical and emotional harm.

109.    Both M.V.A. and B.E. lost significant weight due to the stress of their separations.  At the shelter in New York, B.E. would spend nights crying, overcome with feelings of depression and nausea.  He recalled feeling very sad for his mother and missing her a lot.  B.E. was so overwhelmed with the distress—of being separated from his mother, worrying about her wellbeing, unsure if he would see her again, and unable to contact her— that he stopped eating during his time at the shelter.  After four days of nausea and eating very little, B.E. was taken out of the shelter and to a hospital, where the hospital staff found that he was malnourished and told him he needed to eat.

110.    Not only did the ORR facility provide minimal psychological support for the distraught children, but shelter staff also emotionally abused B.E.  Staff told him that they

would only reunite him with his mother if he behaved well and that, if he behaved badly, he would have to stay longer at the shelter.  Terrified by this threat, B.E. tried his best to behave so that he could see his mother again.

111.   M.V.A. spent an agonizing month in a state of constant uncertainty and fear about where her son was and how he was coping.  She replayed the scene of B.E. crying uncontrollably as he was placed into a separate cell from her over and over in her head, unable to bear the sorrow.  This sadness was compounded by the constant fear of deportation and confusion about the immigration process while she was detained.  M.V.A., too, experienced nausea and barely ate while separated from B.E.

112.   M.V.A. and B.E. both continue to deal with the psychological and physical impact of the separation; neither of them have overcome or forgotten the trauma of what they endured.  To this day, M.V.A. continues to experience depression and anxiety.

113.   M.V.A.'s medical issues worsened after her release.  Her molar, ear, and ankle problems persisted for many months.  The pain in her ankle, which she injured on her journey to the United States, was further exacerbated by the ankle monitor ICE placed on her despite knowing that her ankle was injured.

114.   B.E. has also not been the same since the separation.  Once a gregarious child who enjoyed being outside, he now suffers from separation anxiety and has been fearful ever since the forcible separation.  He is especially afraid to be alone or apart from M.V.A.  He is afraid whenever his mother has to go to work.  M.V.A. also constantly worries that someone will take B.E. away from her again.  Neither M.V.A. nor B.E. have been able to overcome the trauma of what they endured.

### D.    B.C.O. and M.A.

#### 1.    The Two-Month Separation of B.C.O. and M.A.

115.   On May 23, 2018, Plaintiff-Parent B.C.O. and his thirteen-year-old son M.A. entered the United States about two miles east of the San Luis, Arizona Port of Entry.  As onerous as their journey from Guatemala to the United States was, according to B.C.O., their suffering truly began once they crossed the border into the United States.

116.   Shortly after B.C.O. and M.A. entered the United States, CBP officers apprehended them and brought them to the Yuma Border Station.  Officers placed B.C.O. and M.A. in a crowded cell with about eight other people.

117.   A few hours after their arrival, in the middle of the night, officers took B.C.O. to a different room to sign paperwork.  The officers provided the papers only in English and did not supply a translator or otherwise explain what the papers contained, but B.C.O. recalls writing on those forms that M.A. was his son.

118.   B.C.O. and M.A. spent two days in the small cell.  They were not allowed to bathe or change their clothes.  The cell itself contained no water fountain, and officers did not provide them with any water during this time.  During the two-day period, they provided M.A. with only one juice box.  B.C.O. and M.A. were accordingly forced to drink the strange-tasting and -smelling water from the faucet next to the toilet.  They also used this water to make ramen noodles—the only food provided during their two-day detention. The cell was small and very crowded.  It had no beds, forcing M.A. and B.C.O. to sleep on the cell's floor, covering themselves with only an aluminum blanket.  Even on the floor, there was almost no space to sleep.

119.   After two days in this facility, an officer again took B.C.O. to another part of the station to sign paperwork.  As before, officers did not explain anything to B.C.O. and provided no interpreter.  B.C.O. still does not know what he signed.

120.   In the few minutes B.C.O. was out of the cell to sign the paperwork, officers took M.A. and several other children out of their cells and lined them up.  The officers only spoke English and did not explain to the children what was happening or where they were going; they instead put M.A. and the other children on a truck and drove them away.

121.   While B.C.O. was signing the paperwork, he saw the officers line M.A. and the other children up and lead them out of the facility.  By the time he returned to the cell, M.A. was gone.  Other parents informed B.C.O. that M.A. had been taken away, but that the officers never explained why they had taken M.A. or what was happening.  B.C.O. and the other parents were confused and began panicking and crying for their children.  They

yelled to get the officers' attention, but the officers ignored them.  B.C.O. was terrified that something bad would happen to M.A., and that he might not see his son for a long time.

122.    After being separated from his father, M.A. was processed as an unaccompanied minor despite being apprehended with his father and the existence of documents indicating that M.A. was B.C.O.'s son.  DHS transferred M.A. to Canyon State Academy Rite of Passage, a shelter for unaccompanied children in Arizona.  M.A. did not see his father again until they were reunited two months later.  Throughout the separation, he worried about his father in detention and feared that he would never leave the shelter or see his father again.

123.    A few hours after officers took M.A. away, an officer came to B.C.O.'s cell, lined him and other men up, and took them to a different cell.  That cell was filled with about 150 other people; it was so overcrowded that not everyone could lie down at once. The cell had only two or three toilets, none of which provided any privacy.  B.C.O. was still unable to shower or change his clothes.  During this time, officers gave him and his cellmates only ramen noodles to eat.  Officers did not give him any water, so he drank the foul water from the faucets near the toilets out of old ramen containers.

124.    After about a week in this cell, officers called B.C.O. to line up with a group of other men.  B.C.O. describes the next location he was taken to as another "icebox" facility.  He was again placed in a small cell, given only ramen noodles to eat, and given no water.  He was again forced to drink foul water from the faucets in the cell.  And he was again forced to sleep on the cold floor.  He asked about his son every opportunity he got but officers gave him no information.

125.    After having spent twelve days in "icebox" facilities, crammed into overcrowded cells, sleeping on cold floors, eating only noodles, and drinking malodorous water from a tap next to a toilet, B.C.O. was transferred to ICE custody at the Otero County Processing Center in Chaparral, New Mexico.  There, B.C.O. again asked officials for information about his son but received none.  He learned how to use "request" cards to

officers, writing, "I want to see my son, where is he?"  He submitted four or five of these cards but never got a response.

126.   B.C.O. constantly worried about his son.  He cried for him, had recurring thoughts that his son had been killed, and suffered nightmares of the same.  B.C.O.'s anguish was such that he developed chronic headaches, a fever, and flu-like symptoms.

127.   Two weeks into B.C.O.'s time at Otero—and about a month since being separated—human-rights workers came to the facility and collected information from the parents about their separated children.  B.C.O. gave them M.A.'s name and description.  With no assistance from the government, the human-rights workers used the information to locate M.A. and helped B.C.O. call him for the first time.

128.   B.C.O.'s call with M.A. was brief, and they were both crying during the call.  They had only one other phone call while in ICE custody, a few weeks later.  Officers denied B.C.O.'s other repeated requests to call M.A.

### 2.   Reunification

129.   On July 18, 2018, ICE processed B.C.O. for release and transported him to a center near El Paso, Texas.  B.C.O. was not told where he would be released or whether his son would be with him, but when he arrived in El Paso, M.A. was there waiting for him.  B.C.O. rushed towards his son and embraced him.  Father and son held each other and cried, feeling joy and relief at being reunited.

130.   B.C.O. feared that they would be sent back to Guatemala, but B.C.O. and M.A. were instead released on recognizance.

### 3.   Harms and Losses

131.   As a direct result of the government's actions, B.C.O. and M.A. suffered, and continue to suffer, significant physical and emotional harm.

132.   The forcible separation took, and continues to take, an emotional and physical toll on B.C.O. and M.A.  B.C.O. spent over one month in a state of deep uncertainty and fear about where his son was and how he was coping.  He worried constantly about M.A.'s wellbeing and if he would ever see him again.  He cried "the way

a parent cries for his children."  And—with officers refusing to explain where M.A. had been taken or what was happening—B.C.O. felt desperate and distressed throughout his detention.  He had intrusive, recurring thoughts about M.A. being harmed or killed, and suffered from nightmares of the same.  The emotional anguish also manifested physically: B.C.O. developed chronic headaches, a fever, and flu-like symptoms.

133.    Meanwhile, M.A.—only thirteen years old at the time—felt sad and confused during this time apart from his father.  He worried about his father and constantly feared that he would never leave the shelter, that his father would never be released from detention, and that he would never see his father again.  He still thinks about the separation and how it makes him feel.  He remembers the fear and pain of possibly never seeing his father again.

134.    B.C.O.'s agony while detained was further compounded by the constant fear of deportation and confusion about the immigration process.  He continues to have flashbacks of the separation, and fears being deported.  His concerns for M.A.'s wellbeing also persist.  M.A. was a cheerful child before the separation but has been different ever since the separation.  B.C.O. wonders about M.A.'s experiences in the shelters and whether M.A. is afraid to tell him something.

**E.    U.O.L. and F.R.**

**1.    The Nearly Two-Month Separation of U.O.L. and F.R.**

135.    On or about May 30, 2018, Plaintiff-Parent U.O.L. and his then six-year-old son F.R. crossed the border into the United States near San Luis, Arizona.  U.O.L. and F.R. had fled Guatemala to escape persecution.  U.O.L. remembers that they did not have much food during their journey to the United States, which was especially difficult for his young son.  Upon crossing the border, U.O.L. and F.R. soon encountered CBP officers and turned themselves in.  U.O.L. told the officers that he was F.R.'s father.

136.    CBP officers took U.O.L. and F.R. in separate trucks to the Yuma Border Patrol Station "icebox."  There, officers took U.O.L.'s fingerprints and placed U.O.L. and

F.R. in separate cells.  U.O.L. and F.R. could see each other through a glass panel but could not speak with one another.  F.R. often stood at the glass watching his father.

137.    Given only aluminum blankets for warmth, U.O.L. and F.R. could not sleep due to the freezing temperatures.  They never knew if it was day or night, because the only light in the cell came through a fluorescent bulb.  As difficult as the trek from Guatemala to the United States was, U.O.L. recalls being most fearful while being detained by the government.  There were about 50 or 60 people in U.O.L.'s cell, and there was not enough space on the floor for everyone to lie down on the floor to sleep.  U.O.L. was unable to shower, and the only food he was given was cold soup.  U.O.L. and other migrants repeatedly asked officers to lower or turn off the air conditioning because it was extremely cold.  Taunting the detainees, the officers would reply that they were hot and that they would keep the air conditioning turned up high.[101]

138.    U.O.L. and F.R. spent four days in separate cells at the "icebox" before officers approached U.O.L.'s cell and called him by name.  They then brought F.R. to him and instructed them both to say their goodbyes.  Officers told U.O.L. that they were taking F.R. to a shelter, but when he asked where the shelter was, they said they did not know.[102] Officers explained that the government's current policy was to separate parents from their children.  Officers gave U.O.L. only five minutes to say goodbye to his six-year-old son, who was sobbing uncontrollably and wrapping himself around U.O.L.'s leg, clinging onto his pants.  With neither willing to let go of the other, officers grabbed F.R.'s hands and pried them from his father's legs.  F.R. continued to sob and begged not to be taken away.

139.    After being forcibly separated from his son, U.O.L. spent the rest of the night on the cold floor of his cell with nothing but an aluminum blanket to cover him. Throughout the separation, he repeatedly asked officers about his son, but neither the

---

[101] This accords with reports of "CBP officers lowering the temperature in response to complaints" by detainees of "extremely cold temperatures."  Human Rights Watch, *supra* note 56, at 37 (citing Order re Plaintiffs' Motion to Enforce and Appoint a Special Monitor at 16, *Flores v. Johnson*, No. CV 854544 (C.D. Cal. June 27, 2017)).

[102] Records indicate that F.R. was admitted to the Juvenile Facility Estrella del Norte in Tucson, Arizona on June 2, 2018.

English-speaking officers nor the Spanish-speaking ones were responsive; they either ignored him or told him they did not know.  Throughout his entire time in detention, no officer ever gave U.O.L. a reason for the separation.  He only learned about his six-year-old's whereabouts right before their reunification.

140.    U.O.L. was then transferred to the Otero Processing Center, where he was detained with about 100 other people in a single cell for approximately 45 days.

141.    During his time in detention, U.O.L. repeatedly asked officers about his son.  Officers told U.O.L. that he could not contact F.R. and that they did not know the whereabouts of F.R.  U.O.L. recalls that officers treated him poorly and responded harshly to his questions about F.R., refusing to tell him when, or even *if*, he would be reunited with his son.

142.    While in detention, officers forced U.O.L. to perform manual labor as punishment for minor infractions and threatened to send him to the "pozo," or solitary confinement, if he disobeyed.  On one occasion, an officer reported U.O.L. for accidentally wearing his shirt untucked and, as punishment, forced him to mop the floors of the detention center.  The officer threatened him with solitary confinement for two or three days if he did it again.

143.    U.O.L. was also not given sufficient food, had no privacy, and had to shower in the presence of at least 50 other detainees.  Additionally, every night, a nurse would walk through the center, distributing pills and waking people up to take them.  U.O.L. recalls they were all different colors.  Although the nurse indicated at various points that they helped with sleeping, headaches, anxiety, and other issues, no one ever told U.O.L. or other detainees the names of the drugs or any other information about what they were taking.  The nurse forced him and other migrants to take all the pills, making them open their mouths to prove they had swallowed them.  Although U.O.L. suffered from headaches and insomnia—induced by the distress of the separation and worrying about his son—he sometimes tried to refuse the pills.  The nurse, however, would insist, and U.O.L. would ultimately acquiesce because he feared the consequences of any further resistance.

144.    Throughout his detention, U.O.L. consistently asked about F.R. but received no information from any of the officers.  At one point, officers presented U.O.L. with paperwork that he did not understand and was not explained to him.  Officers tried to force him to sign it, telling him that if he did, he would be returned to Guatemala, where F.R. would later join him.  U.O.L. refused.  At no point was he provided access to an attorney, interpreter, or translator.

145.    A few days before they were reunited—and almost two months into their separation—officers called for U.O.L. and told him he had a call with his son.  The call lasted less than ten minutes.  U.O.L. asked F.R. where he was and how he was doing.  Crying hysterically, F.R. said that he did not know or understand where he was and repeatedly asked where his father was.

146.    During that call, U.O.L. also spoke with one of F.R.'s schoolteachers at the shelter.  She told him that F.R. asked about U.O.L. constantly and that he was almost always crying.  U.O.L. began to cry at the thought of F.R. crying and so distraught for months without his father.  The teacher also said F.R. had trouble sleeping.

147.    U.O.L. asked the teacher where the shelter was located, because he still did not know where his son was, but the teacher did not answer his question.  U.O.L. asked the officers who helped set up the call the same question—presuming they knew because they had the shelter's number—but they similarly refused to tell him.

## 2.    Reunification

148.    A few days after the phone call, officers told U.O.L. that they were going to reunite him with F.R. because of the protests against the Family Separation Policy.

149.    Officers transported U.O.L. to a new detention center in El Paso, Texas, but F.R. was not there.  When U.O.L. asked officers why he and his son had not been reunited yet, they told him it was because F.R. was in Tucson, Arizona.  It was only at that point that U.O.L. learned about F.R.'s whereabouts during the separation.

150.    After waiting three or four days in El Paso, on or about July 18, 2018, officers directed U.O.L. and over ten other parents to wait outside as several trucks filled with

children arrived.  As he waited, U.O.L. grew increasingly anxious because he did not see F.R., and he feared that F.R. might not be on the truck with the other children.  Thankfully, F.R. eventually appeared and ran to his father, hugging him and sobbing.  U.O.L. was momentarily happy until he noticed how skinny F.R. had gotten and realized the gravity of what they had experienced.

151.    U.O.L. signed some papers—again incomprehensible to U.O.L. because they were in English—and both he and F.R. were released.

### 3.    Harms and Losses

152.    As a direct result of the government's actions, Plaintiffs suffered and continue to suffer significant physical and emotional harm.

153.    U.O.L. spent approximately two agonizing months in a state of constant uncertainty and fear about where his six-year-old son was and how he was coping.

154.    Throughout his time in detention, U.O.L. rarely slept and repeatedly experienced flashbacks of F.R. hysterically crying at the time of separation, unable to bear the grief it caused him.  This anxiety was further compounded by the constant fear of deportation and confusion about the immigration process U.O.L. experienced while he was detained.

155.    Even after U.O.L. was released and reunited with his son, he continued to experience depression, anxiety, and headaches.  He actively tries to forget this agonizing two-month ordeal.

156.    F.R. cried constantly at the shelter, distraught at not knowing where he was or what had happened to his father.  He told U.O.L. that other children at the shelter regularly cried as well.  F.R. was very confused the entire time he was separated.  He had no idea where he was or where his father was, and constantly asked for his father.  No one told F.R. anything about his father or when they would be reunited.

157.    For about three weeks after reunification, F.R. could not bear being away from U.O.L.  When U.O.L. would have to leave the house, the person who watched F.R. would frequently call U.O.L. to tell him F.R. was crying constantly and asking where his

father was.  F.R. is now very afraid of the dark, struggles to sleep alone, and continues to experience nightmares.

## CLAIMS FOR RELIEF

### COUNT 1: Intentional Infliction of Emotional Distress

158.   All prior allegations set forth in this Complaint are incorporated by reference as though set forth fully herein.

159.   By engaging in the acts described in this Complaint, Defendant and the federal officials and officers referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

160.   As a direct and proximate result of that conduct, Plaintiffs suffered and continue to suffer severe emotional distress and substantial damages.

161.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

### COUNT 2: Negligence

162.   All prior allegations set forth in this Complaint are incorporated by reference as though set forth fully herein.

163.   Defendant and the federal officials and officers referenced above had a nondelegable and nondiscretionary duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs, as well as a nondelegable and nondiscretionary duty of protection and aid against harm.

164.   By engaging in the alleged acts herein, Defendant and the federal officials and officers referenced above failed to act with ordinary care and breached the duties of care and protection owed to Plaintiffs.

165.   As a direct and proximate result of the referenced conduct, Plaintiffs suffered and continue to suffer substantial damages.

166.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

**COUNT 3: Loss of Consortium**

167.    All prior allegations set forth in this Complaint are incorporated by reference as though set forth fully herein.

168.    By engaging in the alleged acts herein, Defendant and the federal officials and officers referenced above committed the torts of negligence and intentional infliction of emotional distress and caused substantial trauma and significant interference in the parent-child relationship.

169.    As a direct and proximate cause of the referenced conduct, Plaintiffs suffered and continue to suffer substantial trauma, loss of society, companionship, care, support, affection, and substantial damages.

170.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for loss of consortium.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request:

A.    Compensatory damages;

B.    Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.    Such other and further relief as the Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

FTCA claims are tried to the bench.  28 U.S.C. § 2402.  Plaintiffs demand a jury trial on any claims that are, at the time of trial, triable by jury, whether because of a change of law or an amendment to the pleadings.

RESPECTFULLY SUBMITTED this 25th day of July, 2022.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By:    *s/Alejandro Barrientos*
Alejandro Barrientos
Gary Bendinger
Katie Derrig
201 East Washington Street, Suite 1200
Phoenix, AZ 85004

Justin W. Bernick*
Danielle Desaulniers Stempel*
Michael J. West*
Dana A. Raphael*
Melissa Giangrande*
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

Cory Szczepanik*
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202

Mohan Warusha Hennadige*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017

Tamara F. Goodlette*
Vanessa Rivas-Bernardy*
REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES (RAICES)
1305 North Flores Street
San Antonio, TX 78212

*Attorneys for Plaintiffs*

*(*Pro hac vice application forthcoming)*

46