GARY M. RESTAINO
United States Attorney
District of Arizona
LAURENCE G. TINSLEY, JR.
Assistant U.S. Attorney
Arizona State Bar No. 012581
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona  85004-4449
Telephone:  (602) 514-7500
Civil Fax:  (602) 514-7760
Main Fax: (602) 514-7693
Email:  Laurence.tinsley@usdoj.gov
*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| M.S.E., on her own behalf and on behalf of her minor child, J.M., <br><br> M.V.A on her own behalf and on behalf of her minor child, B.E., <br><br> B.C.O. on his own behalf and on behalf of his minor child, M.A., and <br><br> U.O.L., on his own behalf and on behalf of his minor child, F.R., <br><br>               Plaintiffs, <br><br> v. <br><br> United States of America, <br><br>               Defendant. | CV 22-01242-PHX-SMM <br><br> **MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** |

Defendant United States of America moves to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction.  As discussed below, Congress has not waived sovereign immunity for the types of claims that Plaintiffs have asserted in this action, thus jurisdictionally barring them. This motion is based on the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      Overview.

On various dates in May 2018, Plaintiffs M.S.E., M.V.A., B.C.O., and U.O.L. (Plaintiff-Parents) unlawfully entered the United States near Yuma, Arizona with their

respective minor children, J.M., B.E., M.A., and F.R. (Plaintiff-Children). The Plaintiff-Parents were initially detained for potential prosecution and eventual immigration processing and were separated from their children under federal policy and statute. Within weeks, as the parents' immigration cases proceeded, they were reunited with their respective children.

All the Plaintiffs bring this action under the Federal Tort Claims Act (FTCA), seeking monetary damages for alleged injuries caused by (1) Defendant's implementation of a policy to refer for prosecution all individuals suspected of illegally entering the United States at the United States-Mexico border, including parents traveling with children (referred to as the "Zero-Tolerance Policy"), and (2) the conditions of confinement and treatment of Plaintiffs after they were separated. Plaintiffs assert claims for intentional infliction of emotional distress, negligence and loss of consortium. *See* Dkt. 1, Complaint, ¶¶ 158-70.

The United States has denounced the prior practice of separating children from their families at the United States-Mexico border and "condemn[ed] the human tragedy" that occurred because of the Zero-Tolerance Policy. *Establishment of Interagency Task Force on the Reunification of Families*, Exec. Order 14,011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 5, 2021). The Biden Administration has committed the federal government to "protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law." *Id.*

That said, the Court should not reach the merits of Plaintiffs' FTCA claims. Plaintiffs' alleged injuries are not compensable under the FTCA because Congress has not waived the federal government's sovereign immunity for claims for money damages in these circumstances. Though the United States recognizes that district courts adjudicating FTCA claims arising out of the Zero-Tolerance Policy – including in this District – have reached differing conclusions on the threshold jurisdictional arguments presented in similar motions to dismiss, a better reading of the law demonstrates that Congress has not waived sovereign immunity and Plaintiffs may not recover under the FTCA.

## II.      Factual and legal background.

*A.*   *Statutory framework for noncitizens[1] entering the United States.*

Under Title 8 of the U.S. Code, when a noncitizen enters the United States between official ports of entry, he or she may be prosecuted for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers." 8 U.S.C § 1325(a). Section 1325(a) is a misdemeanor that is punishable by a fine and 'imprison[ment] not more than 6 months for a first infraction. *Id*. A subsequent violation may result in imprisonment of not more than two years. *Id.*

Noncitizens who arrive in the United States, including those who arrive between ports of entry, are considered "applicant[s] for admission" and are "inspected by immigration officers" to determine their admissibility to the United States. 8 U.S.C. §§ 1225(a)(1), (a)(3), (b). Individuals arriving in or present in the United States who, following inspection, are deemed inadmissible, are also subject to removal from the United States and, as appropriate, detention pending such removal. *See id*. §§ 1225(b); 1226; 1357. These provisions apply to both adults and children. Detention of noncitizens with final orders of removal is governed by 8 U.S.C. § 1231(a). It authorizes detention in two circumstances: "During the removal period," the Attorney General "shall" detain the individual. *Id.* § 1231(a)(2). "[B]eyond the removal period," the Attorney General "may" continue to detain certain individuals specified in the statute or release them under an order of supervision. *Id.* § 1231(a)(3). The removal period lasts 90 days, and begins on the latest of the following: (1) the date the order of removal becomes administratively final; (2) if the removal order is judicially reviewed, and if a court orders a stay of the removal of the individual, the date of the court's final order; or (3) if the noncitizen is detained or confined (except under an immigration process), the date the individual is released from detention or confinement. *Id.* § 1231(A)(1). The federal government possesses statutory authority to "arrange for appropriate places of detention for

---

[1] This brief uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (*quoting* 8 U.S.C. § 1101(a)(3)).

1  aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1).

2      In some cases, the Department of Homeland Security (DHS) may exercise its

3  discretion to release a noncitizen from custody, as occurred with each of the Plaintiffs in this

4  case. *See, e.g.*, 8 U.S.C. §§ 1182(d)(5), 1226(a)(2). Those determinations are made under

5  prescribed circumstances on a "case-by-case basis." 8 U.S.C. § 1182(d)(5); 8 C.F.R. §§

6  235.3(b)(2)(iii) and (b)(4)(ii). The federal government further possesses statutory authority to

7  "arrange for appropriate places of detention for aliens detained pending removal or a decision

8  on removal." *See* 8 U.S.C. § 1231(g)(1).

*B.* 9  *Statutory framework for immigration custody relating to unaccompanied minors.*

10      Federal immigration law authorizes the United States to provide for the custody and

11  care of minor children who are present in the United States without lawful immigration status.

12  Specifically, the Department of Health and Human Services' (DHHS) Office of Refugee

13  Resettlement (ORR) is charged with "the care and placement of unaccompanied alien children

14  who are in federal custody by reason of their immigration status." 6 U.S.C. §§ 279(a),

15  (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1). The term "unaccompanied alien child"

16  or "UAC" is defined as a child who: (1) "has no lawful immigration status in the United

17  States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom…there is no

18  parent or legal guardian in the United States [or] no parent or legal guardian in the United

19  States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

20      Under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), any

21  federal department or agency shall "transfer the custody of such child to [ORR] not later than

22  72 hours after determining that such child is an unaccompanied alien child" except in the case

23  of exceptional circumstances. 8 U.S.C. § 1232(b)(3). ORR seeks to place UACs "in the least

24  restrictive setting that is in the best interest of the child." *Id.,* § 1232(c)(2)(A). However,

25  ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(b)(2).

26  Once in ORR custody, detailed statutory and regulatory provisions must be followed before

27  the child is released to an approved sponsor. *See* 8 U.S.C. § 1232(c)(3). Congress requires

28  that "an unaccompanied alien child may not be placed with a person…unless the Secretary of

1   Health and Human Services makes a determination that the proposed custodian is capable of

2   providing for the child's physical and mental well-being" and that "[s]uch determination

3   shall, at a minimum, include verification of the custodian's identity and relationship to the

4   child, if any, as well as an independent finding that the individual has not engaged in any

5   activity that would indicate a potential risk to the child." *Id.* § 1232(c)(3)(A).   In some

6   instances, a home study is required.  *Id*., § 1232(c)(3)(B).

C. 7   *Flores Agreement requirements.*

8   In 1996, the federal government entered into a settlement agreement referred to as the

9   "Flores Agreement." *See Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF

10   No. 101).  The Flores Agreement "sets out nationwide policy for the detention, release, and

11   treatment of minors in the custody of the [immigration authorities]." *Flores v. Lynch*, 828

12   F.3d 898, 901 (9th Cir. 2016) (*citing* Flores Agreement ¶ 9).  Under a binding interpretation

13   of the Ninth Circuit, the Flores Agreement "unambiguously" applies both to unaccompanied

14   minors and to minors who are encountered together with their parents or legal guardians. *Id.*

15   at 901.  Under the Flores Agreement, the government must expeditiously transfer any minor

16   who cannot be released from custody to a non-secure, licensed facility. *Id*. at 902-03 (*quoting*

17   Flores Agreement ¶ 12).   The government must also "make and record the prompt and

18   continuous efforts on its part toward…release of the minor." *Flores v. Rosen*, 984 F.3d 720,

19   738 (9th Cir. 2020) (*quoting* Flores Agreement, ¶ 14).

20   Notably, the Flores Agreement applies only to minors.  *Flores*, 828 F.3d at 901.  It

21   "does not address…the housing of family units and the scope of parental rights for adults

22   apprehended with their children[,]" and it "does not contemplate releasing a child to a parent

23   who remains in custody, because that would not be a 'release.'" *Flores*, 828 F.3d at 906; *see*

24   *also United States v. Dominguez-Portillo*, 2018 WL 315759, at *9 (W.D. Tex. Jan. 5, 2018)

25   ("[*Flores*] does not provide that parents are entitled to care for their children if they were

26   simultaneously arrested by immigration authorities[.]").  Nor does the Flores Agreement

27   provide any rights to adult detainees, including any rights of release.  *Flores*, 828 F.3d at 908;

28   *see also Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte v. Chertoff*, 2007 WL

1074070, at *16 (W.D. Tex. Apr. 9, 2007). Although the Flores Agreement gives preference to release of minors to a parent, this preference "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908.

D.  *Executive Branch directives regarding immigration enforcement.*

During the time period relevant to this action, the Executive Branch issued several directives regarding enforcement of federal immigration laws. First, Executive Order 13767 was issued in January 2017. *See* § 1, 82 Fed. Reg. 8793 (Jan. 30, 2017) ("EO 13767"). The EO stated that "[i]t is the policy of the executive branch to…detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]" *Id*. § 2(b). Executive Order 13767 directed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law," *Id*. § 6, and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute…and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." *Id*. § 11(d).

Second, on April 11, 2017, the Department of Justice (DOJ) issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement and directed that federal law enforcement agencies prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325 and illegal reentry of individuals who had been removed previously under 8 U.S.C. § 1326. *See* U.S. DOJ Memorandum on Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download.

Third, on April 6, 2018, DOJ issued a "Memorandum for Federal Prosecutors along the Southwest Border." U.S. DOJ News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), DOJ 18-417, 2018 WL 1666622 (the "Zero-Tolerance Memorandum"). The memorandum directed federal prosecutors along

the United States-Mexico border "to the extent practicable, and in consultation with DHS, to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *Id*.  In addition, on May 4, 2018, the DHS Secretary directed officers and agents to ensure that all adults deemed prosecutable for improper entry in violation of 8 U.S.C. § 1325(a) are referred to DOJ for criminal prosecution.  This initiative applied to all amenable adults, including parents or legal guardians traveling with minor children. Consistent with EO 13767 and the April 2018 Zero-Tolerance Memorandum, DHS began to refer for prosecution increased numbers of adults – including those traveling with children – who unlawfully entered the United States along the Southwest border in violation of Section 1325.  *See generally* EO 13767. Minor children of those adults were transferred to ORR custody as required by the TVPRA.

*Factual History of Plaintiffs.*

    *1. M.S.E. and J.M.*

According to the complaint, Plaintiffs M.S.E. and J.M. are a mother and son from Guatemala.   Dkt. 1, Complaint, ¶ 61.  On May 18, 2018, they entered the United States between the ports of entry near Yuma, Arizona. They were apprehended by U.S. Border Patrol Agents (BPAs), with U.S. Customs and Border Protection (CBP), who determined that they were citizens of Guatemala who had crossed the border illegally. Both were transported to a Patrol Station within Yuma Sector in Yuma, Arizona.  *Id*., ¶¶ 61-62.

    For a temporary period, M.S.E. and J.M. stayed in a cell together.  As with all the Plaintiff-Children in this case, J.M. was designated as an unaccompanied minor under 6 U.S.C. § 279(g)(2), meaning they were deemed to be children with no lawful immigration status in the United States, was not yet 18 years old, and had no parent or legal guardian in the United States available to provide care and physical custody.  6 U.S.C. § 279(g)(2).  J. M. was  transferred to the custody of ORR, as required by the TVPRA.  J.M. was taken to a shelter in Texas called Southwest Key Casa Padre, for unaccompanied children.  Dkt. 1, Complaint, ¶¶ 66, 70; Declaration of de la Cruz, Exh. 1, ¶ 12.

    M.S.E. is currently seeking asylum in the United States.  Dkt. 1, Complaint, ¶ 12.  On

1   July 22, 2018, ICE reunified M.S.E. and J.M. Dkt. 1, Complaint, ¶ 82.

2       *2.  M.V.A. and B.E.*

3       On May 17, 2018,  BPAs apprehended M.V.A. and B.E., a mother and her 14-year-
4   old son, near San Luis, Arizona (Dkt. 1, Complaint, ¶ 90).  During initial field questioning,
5   BPAs determined that both were citizens of Guatemala who had crossed the border illegally.
6   Both were transported to Yuma Border Patrol Station within Yuma Sector in Yuma, Arizona.
7   *Id.*, ¶ 91.

8       B.E. left CBP custody the next day, on May 18, 2018.  *Id.*, ¶ 92.  Because M.V.A. was
9   referred for prosecution, she was no longer able to provide care and for her son, and B.E. was
10  designated as an unaccompanied minor under 6 U.S.C. § 279(g)(2).  He was transported to
11  ORR custody over the course of two days from June 18 to June 19, 2018.   He was placed in
12  New York at the Leake and Watts Services facility, where he remained until July 20, 2018.
13  Exh. 1, de la Cruz Declaration, ¶ 13.  The mother, M.V.A., was detained at several facilities,
14  including one in Florence, Arizona.  Dkt. 1, Complaint, ¶¶ 96-97.  On July 20, 2018, M.V.A.
15  and B.E were reunified.  Dkt. 1, Complaint,  ¶ 106-7.  On July 20, 2018, both were released
16  from ICE custody together as a family unit.  Dkt. 1, Complaint ¶ 107. M.V.A. is currently
17  seeking asylum in the United States.   Dkt. 1, Complaint,  ¶ 13.

18      *3.  B.C.O. and M.A.*

19      On May 23, 2018, CBP Officers encountered Plaintiffs B.C.O. and his son, M.A., aged
20  13, near San Luis, Arizona.  Dkt. 1, Complaint, ¶ 115.  During initial field questioning,
21  Officers determined that they were citizens of Guatemala who had crossed the border
22  illegally. They were transported to Yuma Border Patrol Station within Yuma Sector in Yuma,
23  Arizona. *Id.*, ¶ 116.

24      Because B.C.O. was referred for prosecution, he was no longer able to provide care
25  for his son. M.A. was designated as an unaccompanied minor under 6 U.S.C. § 279(g)(2), and
26  transferred to the custody of ORR, as required by the TVPRA.  M.A. was then transferred to
27  a program  in Arizona, called Rite of Passage-Canyon.  Exh. 1, de la Cruz Declaration, ¶ 14.
28      B.C.O. later left CBP custody and was transferred to a secure adult immigration

1   detention center, *i.e.,* Otero County Processing Center in New Mexico.  Dkt. 1, Complaint, ¶

2   125.  B.C.O. learned of his son's location.  Dkt. 1, Complaint, ¶ 127.  He made various efforts

3   to contact him, and through the assistance of the ORR Hotline, was able to complete several

4   calls with his son.  *Id*., ¶¶ 127-128.

5       B.C.O. remained at Otero County Processing Center until his release on July 18, 2018.

6   *Id.*, ¶ 129.  He was served with an Order of Release on Recognizance and released for

7   reunification purposes with his son, which occurred that date.  *Id*., ¶ 129.

8       M.S.E. is currently seeking asylum in the United States.  Dkt. 1, Complaint,  ¶ 12.

9       *4.  U.O.L. and F.R.*

10      On May 29, 2018, CPB encountered Plaintiffs U.O.L. and F.R., aged 6, near San Luis,

11  Arizona.  Dkt. 1, Complaint, ¶ 135.  During initial field questioning, Officers determined that

12  both were citizens of Guatemala who had crossed the border illegally.  *Id*.  They were

13  transported to Yuma Border Patrol Station within Yuma Sector in Yuma, Arizona. *Id*., ¶136.

14      Because U.O.I. was referred for prosecution, he was no longer able to provide care for

15  his son, and F.R. was designated as an unaccompanied minor under 6 U.S.C. § 279(g)(2), and

16  transferred to the custody of ORR, as required by the TVPRA.  F.R. was an taken to the

17  Southwest Key-Estrella program in Arizona under ORR custody from June 1, 2018, to July

18  18, 2018.  Exh. 1, de la Cruz Declaration, ¶ 15.

19      U.O.L. was transferred to a secure, adult immigration detention center, Otero County

20  Processing Center.  Dkt. 1, Complaint, ¶ 140.

21      U.O.L. had contact with his son while detained.  *Id.*, ¶¶ 145-146.  He was then

22  transferred to a facility in El Paso, Texas, where ICE reunified him with his son, F.R.  *Id*., ¶¶

23  149-150.  They were released together on July 18, 2018.  *Id.*, ¶ 151.

24       U.O.L. is currently seeking asylum in the United States. Dkt. 1, Complaint, ¶ 15.

F25  *Plaintiffs' complaint.*

26      Plaintiffs bring this action against the United States under the FTCA, 28 U.S.C.

27  §§ 1346(b)(1), 2671-2680, seeking damages for intentional infliction of emotional distress

28  (Count 1), negligence (Count 2), and loss of child's consortium (Count 3).  Dkt. 1, Complaint

at ¶¶ 158-171.  Plaintiffs allege that these harms stemmed from (1) the apprehension of the parents and their separation from their children under the Zero-Tolerance Policy, and (2) the conditions of confinement and treatment of Plaintiffs after they were separated.

Plaintiffs complain about the conditions of the cells, and the lack of availability of food.  Dkt. 1, Complaint, ¶¶ 4, 62, 73, 92, 118, 123, 124, 125, 136, 137, 138, 143.  Plaintiffs also allege that government officials provided the parents with limited information as to their respective child's location, and limited calls between the Plaintiff-Parents and Plaintiff-Children.  *Id*., at ¶¶ 5, 40, 67, 74, 93, 94, 119, 125, 128, 139, 141, 145.

*G.*    *Subsequent policy changes.*

After assuming office, President Biden took action to repudiate the policies that led to Plaintiffs' separation, and to reunify the families affected by those policies. On February 2, 2021, President Biden issued an Executive Order that condemned the "human tragedy" of the prior Administration's Zero-Tolerance Policy.  The Order also committed the United States to "protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law." Family Reunification Task Force EO § 1.  That Order created a Task Force to identify and reunify families separated under the Zero-Tolerance Policy, and to make recommendations for the potential provision of immigration benefits and mental-health services to those separated families.  *Id.* § 4; *see also* Interim Progress Report, Interagency Task Force on the Reunification of Families 3, Nov. 29, 2021, available at https://www.dhs.gov/sites/default/files/publications/21_1129_s1_interim-progress-report-family-reunification-task-force.pdf.

**III.    Standard of review.**

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty*., 343 F.3d 1036, 1039-40 (9th Cir. 2003).  Courts must consider the threshold issue of jurisdiction before addressing the merits of a case. *Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 94 (1998).  Plaintiffs bear the burden of establishing jurisdiction because, by filing a complaint in federal court, they seek to invoke it.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  The Court may dismiss an action under Rule 12(b)(1) if the complaint does not allege facts sufficient to establish subject matter jurisdiction on its face or, even if the complaint asserts grounds for jurisdiction on its face, the evidence does not support a finding of jurisdiction.  *Thornhill Publishing Co. v. Gen. Tel. & Elec. Corp.,* 594 F.2d 730, 733 (9th Cir. 1979).  A facial attack "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039.

By contrast, a factual challenge allows the Court to look beyond the complaint without "presum[ing] the truthfulness of the plaintiff's allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). The Court also can hear evidence outside the pleadings and resolve factual disputes if necessary without treating the motion as one for summary judgment. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1997).  "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence," and the plaintiff's allegations carry no presumption of truthfulness. *Robinson*, 586 F.3d at 685.

A district court cannot hear a suit against the United States unless the government has waived sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional in nature," meaning that a party's failure to establish a waiver of sovereign immunity is properly resolved on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  *See Robinson*, 586 F.3d at 685; *Sierra Club v. Whitman*, 268 F.3d 898, 905-906 (9th Cir. 2001).

**IV.    Plaintiffs' claims are jurisdictionally barred.**

Plaintiffs' claims should be dismissed for lack of jurisdiction. The United States does not defend the merits of the policy choices at issue in this case, which have now been

repudiated.  Indeed, President Biden has condemned the "human tragedy" that resulted from the Zero-Tolerance Policy and committed to not repeat that tragedy. Family Reunification Task Force EO § 1.  But this case does not concern the wisdom of those now-revoked policies. Instead, Plaintiffs are making claims for personal injury damages under the FTCA.  Plaintiffs cannot prevail on their FTCA claims because this Court lacks subject-matter jurisdiction under established legal principles.

A.  *The claims are barred by the discretionary function exception (DFE).*

1.  *Legal standard for the DFE.*

The United States, as a sovereign entity, is immune from suit except when it has specifically and expressly consented to be sued.  *Lehman v. Nakshian*, 453 U.S. 156, 160-61 (1981) (*quoting United States v. Testan*, 424 U.S. 392, 399 (1976)). "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Lehman*, 453 U.S. at 160 (internal quotes and citations omitted). Absent a specific, express waiver, sovereign immunity bars a suit against the government for lack of subject matter jurisdiction.  *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994).

The FTCA is "a limited waiver of sovereign immunity."  *Gonzalez v. United States*, 814 F.3d 1022, 1026 (9th Cir. 2016).  The statute allows individuals to sue the United States when a federal employee's conduct, within the scope of his or her employment, causes "injury, loss of property, or personal injury or death."  28 U.S.C. § 1346(b)(1).  However, the FTCA's waiver of sovereign immunity is subject to exceptions.  *See* 28 U.S.C. § 2680.

When an exception applies, the United States retains its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed.  *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000).  One exception, the "discretionary function exception" (DFE), bars "[a]ny claim" "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a); *see also Gaubert v. United States*, 499 U.S. 315, 325 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

The Supreme Court has established a two-part test to determine if the DFE applies. *United States v. Gaubert*, 499 U.S. at 328-32.  Courts must first ask whether the challenged conduct was in fact "discretionary in nature" – that is, whether the conduct involved "'an element of judgment or choice.'"  *Id.* at 322 (*quoting Berkovitz*, 486 U.S. at 536); *see also Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015).  The first prong is met unless "'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"  *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996) (*quoting Berkovitz*, 486 U.S. at 536); *see also Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001) ("[A] general regulation or policy…does not remove discretion unless it specifically prescribes a course of conduct."); *Reed ex rel. Allen v. U.S. Dep't of Interior*, 231 F.3d 501, 504 (9th Cir. 2000) (since "[n]o federal statute, regulation, or policy require[d] a particular course of action," the agency's actions "could be no other way than by the exercise of discretion").  Even if a regulation contains a mandate to do something, if that mandate involves judgment or choice, the discretion element is satisfied. *See GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1174-75 (9th Cir. 2002). Further, where the policies that inform the conduct at issue allow the exercise of discretion, the defendant's acts or failures to act are presumed to be discretionary.  *Lam v. United States*, 979 F.3d 665, 674 (9th Cir. 2020). Finally, the applicable policies and authorities must be considered in context – "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Id*. at 677 (*citing Gonzalez*, 814 F.3d at 1030).

Second, if the conduct involves choice or discretion, courts must next determine whether the judgment of the government employee was "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23.  Recognizing that tort actions challenging the government's discretionary policy judgments could "seriously handicap efficient government operations," Congress designed the DFE to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through a tort action. *United States v. Varig Airlines*, 467 U.S. 797, 814

(1984).  The focus is whether the "nature of the actions taken," pursuant to an exercise of discretion, "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see also Nurse*, 226 F.3d at 1001 (the decision "'need not actually be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.'") (*quoting Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998)).

The government need not "prove that it considered these factors and made a conscious decision on the basis of them." *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir. 1989).  Indeed, under the second prong, the government actors' subjective motive is immaterial:  "the focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation" but rather "on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Gonzalez,* 814 F.3d at 1027-28 (*quoting Gaubert,* 499 U.S. at 325) (emphasis added).  Where the relevant policies provide for discretion, it must be presumed that the government's actions are grounded in policy when exercising that discretion.  *Lam*, 979 F.3d at 681 (*citing Gaubert*, 499 U.S. at 324; *Chadd*, 794 F.3d at 1104). Further, the statutory text confirms that the exception applies "whether or not the discretion involved [was] abused" by United States officials.  28 U.S.C. § 2680(a); *see also Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (DFE applies where there are allegations of "malicious and bad faith conduct" because "subjective intent is irrelevant to our analysis").

If both prongs of the *Gaubert/Berkovitz* test are met, then the DFE applies, the United States retains its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed.  *See Nurse*, 226 F.3d at 1000.  This result applies even where the government may have been negligent in the performance of such discretionary acts, because "negligence is irrelevant to the discretionary function inquiry." *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991).  As the legislative history of the FTCA explains, the statute's limited waiver of sovereign immunity was "not intended to authorize suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion."  H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10.

1

2

2. 3    *The decisions to refer the Plaintiff-Parents for prosecution under the Zero-Tolerance Policy,*
4      *and to detain them separately from their children in secure adult detention facilities, are*
       *discretionary.*

5      Plaintiffs' claims based on the decision to refer the parents for prosecution and to

6    detain them pending immigration processing, which resulted in their separation from their

7    children, are barred by the DFE because these decisions involved an element of judgment or

8    choice, and are susceptible to policy analysis.

9      Plaintiffs do not contest that CBP had discretion to apprehend them after they crossed

10   the border illegally. Nor do Plaintiffs contest that CBP had discretion to refer them for

11   prosecution under 8 U.S.C. § 1325 (illegal entry) and subject them to immigration detention.

12   Nor do the Plaintiff-Parents allege that the government lacked discretion to transfer the

13   parents to secure immigration detention or to designate the children as unaccompanied under

14   the TVPRA.

15     These decisions, which resulted in the parents' separation from their children pursuant

16   to the TVPRA, are quintessentially discretionary. *See also infra,* Part IV.B (the United States

17   is not liable in tort for carrying out the requirements of the TVPRA). As the Supreme Court

18   has recognized, "[t]he Attorney General and United States Attorneys retain 'broad discretion'

19   to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

20   Indeed, "[t]he Supreme Court has long recognized that 'the Executive Branch has exclusive

21   authority and absolute discretion to decide whether to prosecute a case.'" *In re Sealed Case*,

22   829 F.2d 50, 63 (D.C. Cir. 1987) (*quoting United States v. Nixon*, 418 U.S. 683, 693 (1974));

23   *Smith v. United States*, 375 F.2d 243, 247 (5th Cir. 1967) ("decisions concerning

24   enforcement" are matter of "discretion"). As the Ninth Circuit has recognized, "[t]he decision

25   whether or not to prosecute a given individual is a discretionary function for which the United

26   States is immune from liability" under the FTCA. *General Dynamics Corp. v. United States*,

27   139 F.3d 1280, 1283 (9th Cir. 1998).

28     As other courts have recognized, the particular prosecution policy in place when the

Plaintiff-Parents were detained for prosecution – the subsequently revoked Zero-Tolerance Policy – "amounts to exercise of the prosecutorial discretion that Congress and the Constitution confer on the Attorney General." *Mejia-Mejia v. ICE*, No. 18-1445 (PLF), 2019 WL 4707150, at *5 (D.D.C. Sept. 26, 2019); *see Peña Arita v. United States, 470 F. Supp. 3d 663, 691-92* (S.D. Tex. 2020). The DFE bars the Court from "second-guessing" or inquiring into government actors' intent in exercising that prosecutorial discretion. *Berkovitz*, 486 U.S. at 536; *see also Lam*, 979 F.3d at 673 (*citing Varig*, 467 U.S. at 814). In determining whether the DFE applies, the Court looks only at whether the conduct or decision at issue is "'susceptible' to policy analysis" from an objective perspective – subjective intent is not part of the inquiry. *Gonzalez*, 814 F.3d at 1032. Here, however, the government's decisions were not merely "susceptible to" policy analysis, but the government spelled out the policies it sought to further through its enforcement efforts in a series of Executive Branch directives, as the Complaint itself notes. *See, e.g.*, Dkt. 1, Complaint, Statement of Facts, ¶¶ 22-31.

The parents were detained pursuant to 8 U.S.C. § 1231(a)(2) in secure adult detention facilities. The United States' decisions concerning where to detain the parents were also discretionary and susceptible to policy analysis. Concerns about subjecting prosecutorial motives and decision making "to outside inquiry" are magnified in the immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). There, the federal government possesses the express statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).[2] "Congress has placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986) (emphasis added); *see also Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The INS necessarily has the authority to determine the location of detention of an alien in deportation proceedings…and therefore, to transfer aliens from one detention center to another."); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1046 (S.D. Fla. 1990)

---

[2] Following the Homeland Security Act of 2002, the many references in the INA to the "Attorney General" now mean the Secretary of Homeland Security. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

1    (the Attorney General has discretion over the location of detention); *Van Dinh v. Reno*, 197

2    F.3d 427, 433 (10th Cir. 1999) (the "Attorney General's discretionary power to transfer aliens

3    from one locale to another, as she deems appropriate, arises from" statute).

4         As the Ninth Circuit has explained, "[b]ecause the decision to detain an alien pending

5    resolution of immigration proceedings is explicitly committed to the discretion of the

6    Attorney General and implicates issues of foreign policy, it falls within this [FTCA]

7    exception." *Mirmehdi v. United States*, 662 F.3d 1073, 1081-82 (9th Cir. 2011); *see also*

8    *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) (decisions where to place

9    prisoners are policy-based decisions protected by DFE); *Bailor v. Salvation Army*, 51 F.3d

10   678, 685 (7th Cir. 1995) (decisions whether to detain or release are policy-based decisions

11   protected by DFE); *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (placement

12   decisions are susceptible to policy analysis); *Santana-Rosa v. United States*, 335 F.3d 39, 44

13   (1st Cir. 2003) ("assignment to particular institutions or units…must be viewed as falling

14   within the discretionary function exception to the FTCA").

15        This discretion necessarily entails decisions regarding with whom noncitizens are

16   detained, whether adults and minors can be detained in the same facility, and whether to detain

17   family members together. *See Peña Arita v. United States*, 470 F. Supp. 3d 663, 691-92 (S.D.

18   Tex. 2020) (decisions by DHS to separate family members are protected by the DFE).

19   Although the Flores Agreement contains some requirements concerning the detention of

20   minors, it does not specifically prescribe a course of action and, thus, does not remove the

21   government's discretion.  Moreover, the Flores Agreement does not require release of a parent

22   or mandate that parents be housed with their children.  *Flores*, 828 F.3d at 908; *see also*

23   *Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte*, 2007 WL 1074070, at *16; *see*

24   *supra* at 5-6.  Plaintiffs fail to cite statutes, regulations, policies, or constitutional provisions

25   that prescribe a specific course of action that the government was required to take in

26   connection with the potential prosecution and detention of the Plaintiff-Parents.  Instead, the

27   challenged decisions were the result of the proper exercise of the government's discretion.

28   Accordingly, the exercise of the statutory authority regarding whether and where to detain the

Plaintiff-Parents during immigration processing is protected by the DFE.

For similar reasons, the decision to determine that the Plaintiff-Children were "unaccompanied" within the meaning of the TVPRA is also covered by the DFE.  *See* 6 U.S.C. § 279(g)(2).  Whether a parent is "available to provide care and physical custody" is a policy question vested in federal officials.  *See D.B. v. Poston*, 119 F. Supp. 3d 472, 482-83 (E.D. Va. 2015) ("Federal agencies are afforded discretion under the statutory scheme when classifying juveniles as unaccompanied alien children."), *aff'd in part and vacated in part*, 826 F.3d 721 (4th Cir. 2016).  *See also Baie v. Secretary of Def.*, 984 F.2d 1375, 1377 (9th Cir. 1986) ("[I]nterpretation of the statute is a plainly discretionary administrative act the 'nature and quality' of which Congress intended to shield from liability under the FTCA.").  In this case, the parents were detained in secure adult immigration detention.  In those circumstances, the DFE protects the officials' determination that the children should have been deemed unaccompanied and thus transferred to the custody of ORR.  *See Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 287 (3d Cir. 1995) (a decision was protected by the DFE when it "necessarily reflects the decisionmaker's judgment that it is more desirable to make a decision based on the currently available information than to wait for more complete data or more confirmation of the existing data."),  In this case, the fact that the parents were detained and later transferred to the custody of ICE supports the officials' determination that the Plaintiff-Children should have been deemed unaccompanied and transferred to the custody of ORR.

In the end, Plaintiffs do not allege injury from any government action or decision that was not subject to discretion and not susceptible to policy analysis.  To the extent that Plaintiffs suggest that the government was required to release them, did not have the discretion to detain or prosecute them for criminal violations of immigration law, or did not have discretionary authority to determine that the Plaintiff-Children were unaccompanied, the adoption of the Zero-Tolerance Policy and related Executive Branch directives regarding immigration enforcement – which have since been rescinded – are quintessential discretionary policy judgments subject to the DFE.

3.  *Plaintiffs' remaining claims concerning their conditions of confinement are also barred by the DFE.*

Plaintiffs also bring claims based on the treatment they received while in custody. Among other things, Plaintiffs allege that CBP officials forced them to sit on cold floors without any beds or blankets and with all the lights on, and offered them only soup and water to eat or drink. *See e.g.,* Dkt. 1, Complaint, ¶¶ 4, 62, 73, 92, 118, 123, 124, 125, 136, 137, 138, 143. Plaintiffs further allege that government officials limited calls between the parents and children and provided only limited information to the parents as to where the children had been placed. *Id.* at ¶¶ 5, 40, 67, 74, 93, 94, 119, 125, 128, 139, 141, 145.

While the government is committed to safe and humane treatment of every individual in detention, courts have repeatedly held that claims based on acts or omissions relating to "conditions of confinement" are barred by the DFE because the manner in which the government manages and operates its detention facilities involves discretionary decisions susceptible to policy considerations. *See, e.g.*, *Bultema v. United States*, 359 F.3d 379, 384 (6th Cir. 2004) (decision not to provide bed rails susceptible to policy considerations); *Campos v. United States*, 888 F.3d 724, 733 (5th Cir. 2018) (deficiencies in computer database that failed to reveal immigration status protected by the DFE); *Cosby v. Marshals Service*, 520 F. App'x 819, 821 (11th Cir. 2013) (detainee decisions involve "several policy…including prison security, the allocation of finite resources, and the logistics of prisoner transportation if transfer to an off-site facility is an option"); *Patel v. United States*, 398 F. App'x 22, 29 (5th Cir. 2010) (DFE shielded decision to transfer prisoner); *Antonelli v. Crow*, No. 08-261, 2012 WL 4215024, at *3 (E.D. Ky. Sept. 19, 2012) (collecting cases in which myriad conditions of confinement claims, including claims based on temperature and crowding, barred by DFE); *Lineberry v. United States*, No. 3:08-cv-0597, 2009 WL 763052, at *6 (N.D. Tex. Mar. 23, 2009) ("Plaintiff's allegation of negligent overcrowding falls within the discretionary function exception"). In particular, courts have held that detained individuals have "no right to unlimited telephone use," *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994), and that a detainee's right to telephone access is "subject to rational

limitations in the face of legitimate security interests.," *Id.* (*quoting Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986); *see also Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 559 (E.D. Va. 2006) ("[T]he BOP's provision of telephone services is a matter committed to its discretion that will not be second-guessed through an FTCA claim.").

4.   *Plaintiffs' assertion of unconstitutional conduct does not preclude application of the discretionary function exception.*

Even conduct that violates the Constitution may constitute the type of abuse of discretion that falls under the scope of the DFE.   Thus, Plaintiffs' claims that certain alleged conduct violated the Constitution does not alter the DFE analysis.

Congress did not create the FTCA to address constitutional violations, but rather to address violations of state tort law committed by federal employees.   *See FDIC v. Meyer*, 510 U.S. 471, 477 (1994) ("§ 1346(b) does not provide a cause of action for" a "constitutional tort claim").   As noted, the Supreme Court has explained that when a "federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow," there is no further discretion to exercise. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis added). The Constitution is no different: in some cases, the Constitution may establish such a specific prescription that it removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute.

The Supreme Court has long recognized that conduct may be discretionary even if it is later determined that the conduct violated the Constitution.   The common law doctrine of official immunity thus applies to the exercise of "discretionary functions" even when the conduct violated the Constitution, so long as the constitutional right was not defined with sufficient specificity that the official should have known the act was prohibited. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also*, *e.g.*, *Wilson v. Layne*, 526 U.S. 603, 614-615 (1999) (applying the "discretionary function[]" formulation and holding that officers were entitled

to qualified immunity because, though their conduct violated the Fourth Amendment, the law was not clearly established at the time).

Thus, in *Berkovitz* when the Supreme Court held that a federal mandate must "specifically prescribe[]" conduct in order to overcome the DFE, it referred to official immunity precedent, underscoring that the two standards operate in tandem. 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296-297 (1988)).  Accordingly, the DFE is not made inapplicable by every allegation of unlawful or unconstitutional conduct, but only by a showing that the government official's discretion was cabined by a specific, clearly established directive, accompanied by plausible assertions that the specific directive was violated.  *See, e.g.*, *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019) ("Because…the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail" under the DFE.).

Indeed, even before it specifically addressed the qualified immunity standards applicable to federal employees, the Supreme Court in *Butz v. Economou* explicitly recognized that the DFE would apply even if alleged conduct might later be held unconstitutional.  438 U.S. 478 (1978).  The Court held that officials sued for violations of constitutional rights were entitled to qualified immunity, but not absolute immunity.  The Court explained that if it were otherwise, the remedy that it had recently recognized *Bivens* would be illusory.  As relevant here, the Court noted that "no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused."  *Id.* at 505. *Butz* and subsequent decisions thus leave no doubt that conduct that allegedly violates the Constitution may constitute the type of abuse of discretion that falls under the scope of the DFE.   Notably, Plaintiffs do not set forth any *Bivens* claims in their Complaint.

The Ninth Circuit has declined to decide "the level of specificity with which a constitutional proscription must be articulated in order to remove the discretion of a federal actor."  *Nurse*, 226 F.3d at 1002 n.2; *see also Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1251 (9th Cir. 2019) ("[I]f the district court instead determines that Defendants

1    did violate a nondiscretionary federal constitutional…directive, the FTCA claims may be able

2    to proceed to that degree.").  For the reasons discussed, a court should require the same level

3    of specificity that would be required in determining whether a statute left an employee with

4    no discretion to abuse.

5           Regardless of whether some or all of the alleged acts reflect an abuse of discretion,

6    Plaintiffs have identified nothing in the decisions of the Supreme Court or the Ninth Circuit

7    that removed any official's discretion regarding any of the categories of asserted actions by

8    "specifically prescrib[ing] a course of action for an employee to follow."  *Gaubert*, 499 U.S.

9    at 322.  Indeed, as the Fourth Circuit observed, "we…have been unable to find a substantive

10   due process right to family unity in the context of immigration detention pending removal."

11   *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210-11 (4th Cir. 2019).  While some

12   decisions, including decisions in this District, have concluded that constitutional allegations

13   made the DFE inapplicable, none has analyzed the relevant standards set out in the Supreme

14   Court's FTCA decisions and in its decisions involving official immunity.[3]  Those principles

15   make clear that the DFE bars Plaintiffs' claims.

B.16  *Plaintiffs' claims relating to the decisions to transfer the Plaintiff-Children to the custody of ORR are barred by the FTCA's exception for actions taken while reasonably executing the law.*

17

18         As explained above, the United States is required to "transfer the custody" of children

19   to the care of ORR "not later than 72 hours after" determining that there is no parent available

20   to provide care and physical custody, absent exceptional circumstances.   8 U.S.C. §

21   1232(b)(3).  In this case, the United States made the determination that the Plaintiff-Parents

22   were unable to provide care and physical custody to their children because it had previously

23   made the discretionary decisions to detain the Plaintiff-Parents for potential criminal

24   prosecution and immigration processing, to transfer them to the custody of ICE, and to detain

25   them in secure immigration detention facilities.   Once those protected discretionary

26

27   _____

28   [3] *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020); *Nunez Euceda v. United States*, No. 2:20-cv-10793, 2021 WL 4895748, *3 (C.D. Cal. Apr. 27, 2021); *C.M. v. United States*, No. CV-19-5217, 2020 WL 1698191, *4 (D. Ariz. Mar. 30, 2020).

determinations were made, the TVPRA required that the Plaintiff-Children be transferred to ORR custody. The enforcement of that statutory command cannot form the basis of an FTCA claim.[4]

Plaintiffs' claims relating to the decision to transfer the Plaintiff-Children into custody of ORR are independently precluded because the FTCA prevents the United States from being held liable for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). Thus, "[w]here government employees act pursuant to and in furtherance of regulations, resulting harm is not compensable under the act[.]" *Dupree v. United States*, 247 F.2d 819, 824 (3d Cir. 1957); *see also Accardi v. United States*, 435 F.2d 1239, 1241 (3d Cir. 1970) (claim based on "enforcement of 'rules and regulations'" barred by § 2680(a)). To the extent Plaintiffs allege wrongdoing by government officials for executing and enforcing statutory command, their claims must be barred under the due care exception. 28 U.S.C. § 2680(a).

This exception "bars tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953); *see also* H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10 (it was not "desirable or intended that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort"); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956) (FTCA does not waive sovereign immunity for claims based on employees' acts "performed under and in furtherance of the regulation…even though the regulation may be irregular or ineffective"). Thus, where a government employee's actions are authorized by statute or regulation – even if that statute or regulation is later found unconstitutional or invalid – the claim must be dismissed for lack

---

[4] In reaching the contrary conclusion, district courts have stated that there is no statute or regulation "requiring the separation of Plaintiffs upon their entry into the country." *A.P.F.*, 492 F. Supp. 3d at 996; *see also* C.M. v. United States, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020). But, as just described, federal law does require that children be placed into ORR custody if their parents are unable to provide care and physical custody. For the reasons described above, the decision to detain those parents for prosecution, and to detain them pending removal, is a quintessentially discretionary one.

1   of subject matter jurisdiction.  *See Borquez v. United States*, 773 F.2d 1050, 1052-53 (9th Cir.

2   1985); *FDIC v. Citizens Bank & Trust Co. of Park Ridge, Ill.*, 592 F.2d 364, 366 (7th Cir.

3   1979); *Sickman v. United States*, 184 F.2d 616, 619 (7th Cir. 1950).

C. 4   *Plaintiffs' claims are barred because there is no private person analogue.*

5         Plaintiffs' claims also fail because the government actions that Plaintiffs challenge

6   have no private-person analogue.  The FTCA's waiver of sovereign immunity is limited to

7   "circumstances where the United States, if a private person, would be liable to the claimant

8   in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §

9   1346(b)(1). The statute authorizes tort recovery against the United States only "in the same

10  manner and to the same extent as a private individual under like circumstances."  28 U.S.C.

11  § 2674.  The FTCA does not waive sovereign immunity for claims against the United States

12  based on governmental "action of the type that private persons could not engage in and hence

13  could not be liable for under local law."  *Chen v. United States*, 854 F.2d 622, 626 (2d Cir.

14  1988) (internal quotes omitted).  The FTCA "requires a court to look to the state-law liability

15  of private entities, not to that of public entities, when assessing liability under the FTCA."

16  *United States v. Olson*, 546 U.S. 43, 45-46 (2005).  Though the private person analogue need

17  not be exact, a plaintiff must offer "a persuasive analogy" showing that the government actor

18  sued would be subject to liability under state law if it were a private person.  *Westbay Steel,*

19  *Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992).

20        Because only the federal government has the authority to enforce federal criminal and

21  immigration laws and make detention determinations, there is no private-person analogue

22  supporting a claim under the FTCA. The alleged harms here stem from the federal

23  government's decision to enforce federal immigration laws, to criminally prosecute certain

24  individuals, and to hold parents in custody pending immigration proceedings or prosecution,

25  resulting in their children's placement in the care and custody of ORR.  The United States has

26  not waived its sovereign immunity for such decisions to enforce federal law because there is

27  no private-person counterpart.  *See, e.g., Elgamal v. Bernacke*, 714 F. App'x 741, 742 (9th

28  Cir. 2018) ("[B]ecause no private person could be sued for anything sufficiently analogous to

the negligent denial of an immigration status adjustment application, that claim must be dismissed as well."); *Elgamal v. United States*, No. 13-00967, 2015 WL 13648070, at *5 (D. Ariz. July 8, 2015) ("immigration matters" are "an inherently governmental function"); *Bhuiyan v. United States*, 772 F. App'x 564, 565 (9th Cir. 2019) ("[T]here is, as a general matter, no private analogue to governmental withdrawal of immigration benefits.").[5]

**D.   *Plaintiffs' claims are impermissible direct liability or systemic tort claims.***

The FTCA's limited waiver of sovereign immunity only allows a plaintiff to sue the United States for damages arising from certain torts committed by federal employees acting within the scope of their employment. *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995) (citing 28 U.S.C. § 1346(b)). As the Ninth Circuit has held, the terms "person" and "employee of the government," as used in the FTCA, mean individuals and natural persons – not institutions or corporate entities. *Adams v. United States*, 420 F.3d 1049, 1052-55 (9th Cir. 2005); 28 U.S.C. § 2671. Thus, a plaintiff cannot assert "systemic" claims or seek to hold the entire United States government or an entire agency directly liable under the FTCA, but must instead allege tortious conduct by *individual federal employees*, acting within the scope of their employment, for whom the United States has assumed liability for under the FTCA. *See, e.g.*, *Lee v. United States*, 2020 WL 6573258, at *6 (D. Ariz. Sept. 18, 2020) (applying *Adams* and dismissing claims of "generalized negligence" asserted against staff and employees of federal institutions "as a whole" for lack of jurisdiction).

Here, as in *Lee*, Plaintiffs seek to raise direct liability and institutional tort claims against the United States. Plaintiffs attribute the alleged tortious conduct to the government

---

[5] The court in *C.M.* and *A.P.F.* found a private-person analogue to nursing home employees, relying on *Estate of Smith v. Shartle*, 2020 WL 1158552 at *2 (D. Ariz. Mar 10, 2020), a case involving the Bureau of Prisons' duty toward inmates in its care. *See C.M.*, 2020 WL 1698191, at *3; *A.P.F.*, 492 F. Supp. 3d at 995. The *Shartle* court found an analogy to a nursing home's duty of care in Ariz. Rev. Stat. § 46-455, which imposes civil liability on nursing home employees who cause or permit the life of a vulnerable adult to be endangered by neglect. However, a nursing home's duty to safeguard against neglect wholly differs from the federal government's enforcement of federal criminal and immigration laws and does not provide the "persuasive analogy" required for jurisdiction under the FTCA.

1    as a whole, referring throughout their Complaint to "the United States government," "the U.S.

2    government," "the government," and/or unidentified government employees or contractors,

3    rather than specific tortious conduct on the part of specific federal employees for whom the

4    United States must assume liability. *See, e.g.*, Dkt. 1, Complaint, ¶¶ 2, 30, 34, 35, 35(b), 37,

5    38, 58, 84, 96, 108, 131, 152. The FTCA's limited waiver of sovereign immunity does not

6    encompass such "systemic," institutional tort claims or "generalized theories" of tortious

7    conduct "asserted against the staff and employees of federal institutions as a whole." *Lee*,

8    2020 WL 6573258, at *6.

E.   9    *The FTCA's independent contractor exclusion bars Plaintiffs' claims to the extent they are based on Plaintiff-Children's time in ORR custody.*

10

11        The FTCA "was never intended…to reach employees or agents of all federally funded

12   programs that confer benefits on people." *United States v. Orleans*, 425 U.S. 807, 813 (1976).

13   It only waives sovereign immunity for tortious conduct of "an employee of the Government,"

14   and it expressly "excludes 'any contractor with the United States.'" *Id.* (*quoting* 28 U.S.C.

15   § 2671). The FTCA thus preserves sovereign immunity for the torts committed by

16   government contractors or their employees. *Id.*

17        For instance, the Complaint alleges that: after the Plaintiff-Children were placed in

18   ORR custody, J.M. was unable to speak with his mother (*See* Dkt. 1, Complaint, ¶ 71); shelter

19   workers gave J.M. conflicting information about reunification (*Id.*, ¶ 80); shelter workers

20   frightened B.E. by telling him "they would only reunite him with his mother if he behaved

21   well" (*Id.* at ¶ 99); shelter staff did not stop other children from bullying B.E. (*Id.* at ¶ 100);

22   and B.E.'s case manager undertook various efforts to locate a sponsor for B.E. and establish

23   contact with B.E.'s mother (*Id.* at ¶¶ 101-105).[6]

24        To the extent Plaintiffs intend allege tortious acts or omissions, they are not tortious

25   acts or omissions ***by any employee of the United States***. The staff at the various shelters are

26   contractors. *See* Exh. 1 de la Cruz Declaration, at ¶¶ 4, 6, 8. As explained in *Walding v.*

27   _____

28   [6] The Complaint does not appear to make any allegations about M.A.'s or F.R.'s treatment during their time in ORR custody. Even if there were such allegations, the independent contract exclusion discussed herein would apply to bar any claim.

*United States*, 955 F. Supp. 2d 759 (W.D. Tex. 2013), the ORR contractors taking care of UACs are not employees of the United States within the meaning of the FTCA. *Id.* at 791-811.

"A critical element in distinguishing [a statutory employee] from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Orleans*, 425 U.S. at 807. This test excludes the programs that cared for the Plaintiff-Children.  In *Logue v. United States*, 412 U.S. 521, 528 (1973), the Supreme Court held that employees of a county jail that housed federal prisoners pursuant to a contract with the Federal Bureau of Prisons (BO") were not government employees for the purposes of the FTCA.  Although the contract required the jail to comply with BOP rules and regulations prescribing standards of treatment, and the United States reserved rights of inspection to enter the jail to determine its compliance with the contract, the contract did not authorize the United States to physically supervise the jail's employees.  *Id.* at 528-32.  "In short, the United States could take action to compel compliance with federal standards, but it did not supervise operations." *Orleans*, 425 U.S. at 813.

Thus, the FTCA's exclusion of contractors is not overcome by "[c]ontractual provisions directing detailed performance," nor by "[d]etailed regulations and inspections," nor by "the ability to compel compliance with federal regulation."  *Autery v. United States*, 424 F.3d 944, 957 (9th Cir. 2005). Rather, "[t]here must be *substantial supervision over the day-to-day operations of the contractor* in order to find that the individual was acting as a government employee." *Id.* (emphasis added) (*quoting Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987)).

ORR does not exercise substantial supervision and control over the "day-to-day operations" (*Autery*) or "detailed physical performance" (*Orleans*) of the contractor-shelters here. It only conducts general oversight to ensure compliance with governing regulations, policies, and agreements.  *See* Exh. 1*,* de la Cruz Declaration, ¶ 9.  Therefore, as in *Logue* and *Walding*, the program staff are not employees of the government, and the FTCA does not apply to them.

The Complaint does not specifically allege that ORR negligently selected or negligently supervised the shelters.  Even if it did, as *Walding* held, claims like that are barred by the  DFE.  The selection of a contractor to provide custody and care of unaccompanied minors is left to ORR's discretion, and "the ultimate choice of facility for housing unaccompanied alien children is a decision vested with policy considerations." *Walding*, 955 F. Supp. 2d at 771-72.  In addition, ORR has discretion regarding how to supervise its grantees, which involves "policy decisions concerning how to allocate its resources to oversee the facilities and personnel." *Id.* at 783.  *See also In re Consol. U.S. Atmospheric Testing Litig.*, 820 F.2d 982, 995 (9th Cir. 1987) (the DFE barred a claim that government negligently supervised a contractor).

Nor does the Complaint clearly plead vicarious liability.   It only asserts that "HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including the facilities." (Dkt 1, Complaint,  ¶ 19), but offers no further elaboration.  In any event, any possible vicarious-liability claim is untenable. The FTCA is the only waiver of sovereign immunity for tort claims against the United States, and it expressly excludes liability for the acts or omissions of government contractors. Because no waiver of sovereign immunity applies, this claim too is jurisdictionally barred.

## V.      CONCLUSION.

For the foregoing reasons, Defendant requests that this action be dismissed for lack of subject matter jurisdiction.

RESPECTFULLY SUBMITTED this 15th day of November, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

s/ *Laurence G. Tinsley, Jr.*
LAURENCE G. TINSLEY, JR.
Assistant United States Attorney
*Attorneys for Defendant*

- 28 -

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants in this case:

Alejandro David Barrientos
Jones Skelton & Hochuli PLC
40 N Central Ave., Ste. 2700
Phoenix, AZ 85004
602-263-1715
Email:Abarrientos@lewisroca.Com

Cory Szczepanik
Hogans & Lovells US LLP - Denver, CO
1601 Wewatta St., Ste. 900
Denver, CO 80202
920-915-9736
Email:Coryszczepanik@gmail.Com

Dana A Raphael
Hogan Lovells US LLP - Washington, DC
555 13th St., Nw
Washington, DC 20004
202-531-0427
Email:Dana.Raphael@hoganlovells.Com

Danielle Desaulniers Stempel
Hogan Lovells US LLP - Washington, DC
555 13th St., Nw
Washington, DC 20004
202-804-7798
Email:Danielle.Stempel@hoganlovells.Com

Gary Bendinger
Lewis Roca Rothgerber Christie LLP - Phoenix Office
201 E Washington St., Ste. 1200
Phoenix, AZ 85004
914-602-1142
Email:Gbendinger@lewisroca.Com
Justin Bernick
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED

Hogans Lovells US LLP - Washington, DC
555 13th St. Nw
Washington, DC 20004
202-637-5485
Email:Justin.Bernick@hoganlovells.Com

Kathleen Marie Derrig
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Lewis Roca Rothgerber Christie LLP - Phoenix Office
201 E Washington St., Ste. 1200
Phoenix, AZ 85004
602-262-5316
Email:Kderrig@lewisroca.Com

Melissa Giangrande
Hogans Lovells US LLP - Washington, DC
555 13th St. Nw
Washington, DC 20004
202-637-3617
Email:Melissa.Giangrande@hoganlovells.Com

Michael J West
Hogan Lovells US LLP - Washington, DC
555 13th St., Nw
Washington, DC 20004
202-637-8872
Email:Michael.West@hoganlovells.Com

Tamara F Goodlette
Refugee & Immigrant Center for Education & Legal Services -
802 Kentucky Avenue
San Antonio, TX 78201
210-960-3206
Email:Tami.Goodlette@raicestexas.Org

Vanessa Rivas-Bernardy
Refugee & Immigrant Center for Education & Legal Services
1305 N Flores St.
San Antonio, TX 78212
530-207-9898
Email:Vanessa.Rivas@raicestexas.Org
*Attorneys for Plaintiffs*

s/ *Irene Millsaps*
United States Attorney's Office