2:22-cv-01242-SMM, January 17, 2024

1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

M.S.E., on her own behalf and on    )
5   behalf of her minor child on behalf)
of J.M., et al.,                    )
6                                       )
                        Plaintiffs,    )
7                                       )
                vs.                    ) 2:22-cv-01242-SMM
8                                       )
**United States of America**,           )
9                                       ) Phoenix, Arizona
                        Defendant.    ) January 17, 2024
10   _____) 11:00 a.m.

11

12          **BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE**

13          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14                    <u>**SCHEDULING CONFERENCE**</u>

15

16

17

18

19

20
Official Court Reporter:
21   **Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
22   401 West Washington Street
Suite 312, SPC 35
23   Phoenix, Arizona  85003-2150
(602) 322-7245
24
Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

2:22-cv-01242-SMM, January 17, 2024

1                          **APPEARANCES**

2

    For the Plaintiffs:
3        **ALICIA PALLER, ESQ.**
         Hogan Lovells US L.L.P. - Washington, D.C.
4        555 13th St. NW
         Washington, D.C. 20004
5        alicia.paller@hoganlovells.com

6        **KATHLEEN MARY DERRIG RIOS, ESQ.**
         **TODD FELTUS, ESQ.**
7        Lewis Roca, L.L.C. (Phoenix)
         201 East Washington Street, Ste. 1200
8        Phoenix, AZ  85004-4259
         kderrig@lewisroca.com
9        tfeltus@lewisroca.com

10   For the Defendant:
         **LAURENCE J. TINSLEY, ESQ.**
11       U.S. Attorney's Office (Phoenix)
         40 N. Central, Ste. 1800
12       Phoenix, AZ 85004-4408
         laurence.tinsley@usdoj.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

2:22-cv-01242-SMM, January 17, 2024

1               **P R O C E E D I N G S**                    12:00:59

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 11:00.)

4          THE COURT:  Good morning, everyone.  Please be

5     seated.                                                11:00:34

6          COURTROOM DEPUTY:  This is civil case 22-1242, *M.S.E.*

7     *v. United States of America.*

8          This is the time set for Rule 16 scheduling

9     conference.

10         Counsel, please announce.                         11:00:42

11         MS. PALLER:  Good morning Your Honor.  Alicia Paller

12    from Hogan Lovells on behalf of plaintiff.

13         THE COURT:  Okay.  Thank you very much.

14         MS. RIOS:  Good morning Your Honor.  This is Katie

15    Rios, formerly Derrig, on behalf of plaintiffs with Lewis Roca.   11:01:05

16         THE COURT:  Let me see here.  We have so many people

17    here.  Cast of thousands.

18         MR. FELTUS:  Good morning, Your Honor.  Todd Feltus

19    from Lewis Roca, and we're local counsel for the plaintiffs.

20         THE COURT:  Okay.  Thank you.                      11:01:25

21         And is Mr. Bernick going to be with us?

22         MS. PALLER:  Not today.

23         THE COURT:  You're taking care of things?

24         MS. PALLER:  That's correct.

25         MR. TINSLEY:  Good morning, Judge.  Laurence J.      11:01:37

2:22-cv-01242-SMM, January 17, 2024

1   Tinsley, Jr., for the United States.                          11:01:38

2              THE COURT:  Thank you, Mr. Tinsley.

3              MR. TINSLEY:  I'm at the bottom of the list.

4              THE COURT:  Pardon?

5              MR. TINSLEY:  I'm at the bottom of the list.         11:01:44

6              THE COURT:  Well, such is your lot in life today.

7              MR. TINSLEY:  Last but not least.

8              THE COURT:  Well, I wouldn't go that far.  Welcome.

9   I would ask you to do something to help me out here.  If you

10  will remain seated when you're addressing the Court today and  11:02:00

11  use the microphones that are close to you, you can move them,

12  you can bend them, you can move them around.  It's better for

13  the court reporter, myself also.  Large room here today.

14             Now, as an observation before we get started here, I

15  noticed on paragraph three on page six of your case management 11:02:25

16  report at line 17 it says:  The parties agree to work

17  cooperatively to discuss -- so on and so forth.

18             How is it that we could never agree on some of these

19  deadlines and they are one month apart?  That doesn't seem to

20  be cooperative to me.  I mean one month when the deadlines are  11:02:47

21  18 months off in the future.  I don't get that.

22             So I want you to go back to that statement, we're

23  going to work cooperatively here.  That's one thing I do not

24  tolerate is, you know, squabbles, just so everybody knows.

25             Now let's get started here and I notice there's other 11:03:09

United States District Court

1   cases going on similarly; and one of the cases as we go through    11:03:15

2   this, because we have four individual plaintiffs, some

3   represented by the same people, some people not.  How are we

4   going to do that?  Although it's a non-injury case, it's under

5   the Federal Tort Claims Act?  I can separate those but it seems    11:03:31

6   to me like the circumstances of their apprehensions are

7   different.

8          MS. PALLER:  Sure.  I'll be happy to address that,

9   Your Honor.  So there are eight plaintiffs and there are four

10  pairs of parents and their sons.  They were detained by the        11:03:49

11  U.S. Government at the same spot and taken to the same

12  detention facility.  So although the minor plaintiffs were

13  minors at the time, were then disbursed to different shelters,

14  some of the facts actually do overlap such that we think it's

15  fair to try this together.                                          11:04:08

16         If it becomes a case throughout discovery that that

17  isn't feasible, I believe it's wise to discuss that but right

18  now it seems like that could be handled together.

19         And my understanding from some of the other cases

20  that have proceeded through discovery already is that there is      11:04:19

21  a set of discovery that has been referred to as common

22  discovery.  We haven't seen that yet because we haven't entered

23  a protective order yet in this case, but my sense is there are

24  actually a lot of documents that have been produced by the

25  Government in those cases referred to, again, as common             11:04:33

United States District Court

1    discovery regarding the policy, the impetus behind the policy,    11:04:36

2    how it was carried out, all of which is related to all eight of

3    the plaintiffs and four of the families in this case.

4          THE COURT:  All right.  Now, Mr. Tinsley, do you want

5    to add anything to that or not?    11:04:50

6          MR. TINSLEY:  I would just point out, Judge, that we

7    really don't have many disagreements whatsoever in the

8    schedule.  It seems like the only disagreement pertains to the

9    timing of expert disclosures.

10          And I could go further than what Ms. Paller said in    11:05:05

11   that there are common issues with all eight plaintiffs.  This

12   is an eight-plaintiff, four-family case.  And each of the

13   issues are essentially identical, common, or similar, which is

14   why there is, as she said, common discovery that has been

15   circulated in many of the other cases if not all of the other    11:05:35

16   cases.  And I think we have an agreement or we can agree that

17   that common discovery that has been disclosed in the CM and

18   APF cases can be used for the purposes of this case.  So I

19   don't believe we have much of a dispute on anything except the

20   timing for expert disclosures which I can comment on when    11:05:56

21   you're ready for me to do so.

22          THE COURT:  Okay.  Thank you.

23          I would also note that the term Zero Tolerance is not

24   a new phenomenon along the border.  San Diego has been using

25   that for 30 years so it's not a new phenomenon and we know in    11:06:17

United States District Court

1   this district when people come to the United States and they          11:06:21

2   are involved in violation of the law of the United States and

3   they have minors along with them, oftentimes used to disguise

4   their activities -- now, I'm not talking about this case.

5   These are different.                                                  11:06:37

6          But when you arrest the parent, they are often given

7   over to Department of Children's Welfare, things like that or

8   farmed out to a foster home or whatever.  So it's not an

9   unusual thing although it has been made a lot of light of it in

10  light of the immigration situation.  These are not new concepts      11:06:59

11  along the border.  That's an editorial edification to people to

12  understand that.

13         So when they renewed that in the context of

14  immigration, a lot of people have been advocating that for

15  years and years and years when it usually was pretty much            11:07:18

16  referred to in the drug cases.

17         So there you go.

18         All right.  Now, along those lines, I understand in

19  front of Judge Bolton -- there's been a couple of settlements

20  along the way and in light of that, I understand the case with       11:07:37

21  Judge Bolton is going to go to trial in April of this year.  Is

22  anyone here involved in those cases?

23         MS. PALLER:  We are not, Your Honor.

24         MR. TINSLEY:  Our office is involved.  Frankly, I

25  don't know which attorney from our office is involved and it         11:07:54

| | |
|---|---|
| 1 | may be main torts branch is handling that but I am not | 11:07:57 |
| 2 | personally involved in that. | |
| 3 | THE COURT: I was just kind of curious. Was anyone | |
| 4 | here involved with some of the other cases that preceded these | |
| 5 | cases that have settled and/or not? | 11:08:11 |
| 6 | MR. TINSLEY: Same answer. There are attorneys in my | |
| 7 | office who have been involved in settlement discussions on some | |
| 8 | of the other cases that have been listed under one of these | |
| 9 | sections, but I'm not directly involved in it. | |
| 10 | THE COURT: All right. Now, there's another term | 11:08:37 |
| 11 | that was used in your documentation that involves this case so | |
| 12 | I need to get educated, the term of they were designated as | |
| 13 | unaccompanied minors. | |
| 14 | MS. PALLER: I'm happy to speak to that. | |
| 15 | THE COURT: If you would. Help me out. What does | 11:08:55 |
| 16 | that actually mean? | |
| 17 | MS. PALLER: Sure. And this actually goes to your | |
| 18 | comment from a minute ago about the difference between many | |
| 19 | years of what folks have referred to as Zero Tolerance and the | |
| 20 | policy that is the heart of the issue in this case. | 11:09:06 |
| 21 | So there was a shift when this policy was implemented | |
| 22 | which the Government has referred to as Zero Tolerance Policy. | |
| 23 | We refer to it throughout your pleadings and briefing as the | |
| 24 | Family Separation Policy. | |
| 25 | THE COURT: We're not going to do that. Whatever | 11:09:18 |

1    policy they designate is the program.  We're not going to           11:09:20

2    invent a new policy and market that to the jury.  It wouldn't

3    be jury.  It would be to me.

4         MS. PALLER:  Sure.  I'm happy to refer to that as the

5    Zero Tolerance policy but referring to the specific point in        11:09:33

6    time that is at issue here so 2018 time frame.

7         So here what happened was DOJ specifically had

8    instructed that all parents and children should be separated

9    and mandated the criminal prosecution of all persons who

10   crossed the border.                                                 11:09:48

11        THE COURT:  Illegally are.

12        MS. PALLER:  What was that?

13        THE COURT:  Crossed the border illegally.

14        MS. PALLER:  Well, so they actually legally were

15   seeking asylum and that's key here.  They came over to exercise     11:09:58

16   their legal right to seek asylum.  When they crossed, though,

17   the directive was to criminally prosecute all adults.  And once

18   those adults were separated, they then referred to those minors

19   as unaccompanied children.  So they came over -- all four

20   families that are plaintiffs in this case came over together,      11:10:16

21   crossed the border together.

22        When they presented themselves -- so they sought --

23   they sought the border patrol officers and then when they

24   turned themselves in to the border patrol they said we're here

25   as families.  They were asked question about whether they are       11:10:32

United States District Court

1   parents and children.  No one disputed at that time that they          11:10:35

2   were parent-child relationships but once the participates were

3   removed, that's when the Government designated the children as

4   unaccompanied and then sent them to shelters.

5          THE COURT:  Okay.  That helps out.  Thank you.                   11:10:46

6          Mr. Tinsley, do you disagree with that background

7   information?

8          MR. TINSLEY:  Let me just put it this way:  In our

9   answer in I believe footnote one I identified for the Court

10  what an unaccompanied child was.  It's not a novel concept.            11:11:03

11  It's not something that came to light or was created by this

12  new policy.  What was new was that there was going to be a Zero

13  Tolerance for illegal immigrants who came into the country with

14  or without children and an effort was made to prosecute the

15  adults under the Zero Tolerance Policy.                                11:11:24

16         And once the parents were referred to custody by

17  operation of law, the children were no longer accompanied

18  children.  They were unaccompanied under DHHS's rubric and,

19  therefore, they were moved to care homes where they were

20  provided care until the prosecution was resolved.                      11:11:53

21         THE COURT:  Okay.  And who looked after them once

22  they are -- I'll say foster care or temporary care of either an

23  agency or social service agency or someone in the community who

24  says I'll help out and you can -- I'll watch over them.  Who

25  does that?                                                             11:12:19

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1      MR. TINSLEY:  By and large, they went to care homes                11:12:20

2  that were contracted with the office of ORR, which is also

3  defined in our papers.  And the four children at issue here

4  were put in those care homes as unaccompanied children where

5  the homes contract with DHHS and ORR.  They are ORR contractors     11:12:42

6  and they are provided care and education and food and clothing

7  while efforts are made to reunite them and those efforts were

8  made.

9      And in our case, the longest separation was about a

10  two-month period.                                                   11:13:06

11     THE COURT:  That I gleaned from the --

12     MR. TINSLEY:  So they are basically contractors, not

13  direct federal agencies with federal government.

14     THE COURT:  Okay.

15     MS. PALLER:  Your Honor, may I comment on that,                  11:13:21

16  please.

17     THE COURT:  Yes, ma'am, sure.

18     MS. PALLER:  To our point about foster homes, because

19  the period of separation was one to two months for these

20  families, none of the children ended up in what we think of as     11:13:28

21  individual foster homes.  There are some children who were

22  impacted by this policy who were never matched back up; with

23  the parents and our four families are not in that position.

24     After a month or two, for one of them, there was

25  somewhat of a glitch where the minor's name had been taken down    11:13:43

United States District Court

12

2:22-cv-01242-SMM, January 17, 2024

1  incorrectly so there was trouble pairing them back up but                 11:13:48

2  ultimately they were released back to the parents.  The parents

3  were not prosecuted so, you know, that kind of goes back to

4  that initial separation are considering a criminal prosecution

5  and then not ultimately prosecuting.                                      11:13:59

6          THE COURT:  Okay.

7          Now, of course that gets into discretionary acts.

8  Every district along the border has guidelines on what kind of

9  cases they prosecute and immigration cases are one of those.

10  Some people were heavy on the enforcement of 1325s.  Others      11:14:15

11  were 1326 cases only.

12          So if someone says, okay, now we're going to

13  prosecute everybody coming through and yet someone says I came

14  in illegally but I came in to seek asylum in the United States

15  and each -- they at first blush they may not appear to qualify   11:14:39

16  for asylee status, they were given that status.  And how does

17  that play into the fact that your clients were not then

18  prosecuted for that?  Are they still in the country pursuing

19  their asylum claims or that they been removed because they felt

20  that the asylum claims were non-meritorious?                     11:15:04

21          MS. PALLER:  Most of our clients are still in the

22  country and there has been a recent settlement in a case called

23  Ms. L that provided class-wide relief to a number of the folks

24  who were impacted by this policy, including our clients.  And

25  so that was an injunctive-only class-wide settlement that        11:15:19

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1  facilitated a different process by which these folks can seek                    11:15:24

2  asylum than would otherwise be the default case.  So most of

3  our clients are still pursuing that.  They are here as PIP --

4  I'm sorry, I'm trying to remember what that stands for, parole

5  in place I believe -- which is there for the status for folks          11:15:39

6  who came in seeking asylum and have fear of going back to their

7  home country.

8        THE COURT:  Now, you mentioned protective orders that

9  have been in place in other cases and that's understandable but

10 how long would that take to get in place in this case?                  11:16:13

11       MR. TINSLEY:  Well, it's not so much protective

12 orders although I believe there will be a need for protective

13 order as it relates to electronically stored information which

14 I think counsel and I can talk about as we proceed.

15       What we do have is common discovery that is available      11:16:32

16 and that can be provided rather expeditiously.  I believe there

17 was a deadline in our papers for maybe July.  We could probably

18 get that much sooner than July.  It's possible, and I will

19 check with the agencies, that we could get it by the end of

20 February when we do our initial disclosures.                            11:16:55

21       THE COURT:  Well, how is that -- how is this common

22 discovery different from your initial disclosures?  How would

23 that be different?

24       MR. TINSLEY:  There may be significant overlap.

25 Additional documents as it relates to the individual plaintiffs    11:17:12

United States District Court

2:22-cv-01242-SMM, January 17, 2024

```
 1    will also be disclosed.  Records from, for instance, the care       11:17:16
 2    home -- care homes that the children were transferred to and
 3    then additional files pertaining to the adults.  Those are
 4    specific items as to the plaintiffs.
 5            When I refer to common discovery, I'm talking about         11:17:40
 6    more the policy-level discovery that has already been
 7    discovered and which we -- we agree can be used in this
 8    manner -- in this matter.
 9            So both cases involved -- I think I mentioned was
10    CM v. United States and APF v. United States.  And it's no          11:17:58
11    secret that that discovery, that that disclosure is out there
12    and so we believe that the plaintiffs should have that.  They
13    will have it and it can be used in this case without then the
14    need for additional policy-level discovery absent some
15    extraordinary need.                                                 11:18:24
16            MS. PALLER:  I agree with that.  Just to put a finer
17    point on it, my understanding, again, not having seen the
18    common discovery yet, is that it's documents that are not
19    plaintiff-specific so we would still have a need for
20    plaintiff-specific discovery that the Government seeks but also     11:18:38
21    whatever we need from the Government based on the specific
22    locations that they were detained in, who they interacted with
23    during those encounters.
24            MR. TINSLEY:  And I free exactly with what Ms. Paller
25    said.                                                               11:18:53
```

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1    I will also say as part of the common discovery, a          11:18:56

2  number of depositions that were taken from policy-level

3  managers from the agencies involved, we agree that those can be

4  used in this litigation.  There's need to redepose the same

5  people because that information has already been discovered.    11:19:10

6         MS. PALLER:  I would just like to reserve our rights

7  to review the discovery.  We haven't seen anything.  I think

8  that sounds sufficient.  As long as we have what we need from

9  those folks.

10        And going back to your question about a protective       11:19:25

11 order, I would think within the next few weeks we should get

12 something together.  It shouldn't be hard.  I believe we've

13 worked cooperatively together and I'm happy to address timing

14 whenever Your Honor would like to.

15        THE COURT:  All right.  So let's come down to -- let      11:19:40

16 me find my information here.

17        You have indicated you want your initial disclosures

18 to be made on February 29.  That's a Thursday.  I do everything

19 on Fridays and for a reason.  So that before you pack up your

20 suitcases and get out of town and take a vacation, you think is  11:20:30

21 there something due in his court on a Friday?  I better check

22 my -- it's a thing to help you out.  So we're going to move

23 that to March 1.  And you'll get a copy of these dates.

24        MS. PALLER:  Thank you, Your Honor.  Can I comment on

25 that briefly?                                                    11:20:46

2:22-cv-01242-SMM, January 17, 2024

 1          THE COURT:  Yeah.                                          11:20:48

 2          MS. PALLER:  You know, I apologize.  I think in our

 3    initial draft we had everything on a Friday per your

 4    instructions and as we negotiated, we missed the boat on the

 5    Fridays.  So happy for everything to still get bumped to      11:20:55

 6    Fridays and apologies for those that came off of a Friday.

 7          THE COURT:  It happens and not only that, we hit leap

 8    year this year, go figure.  Okay.

 9          Now, I take it at this stage, based on what you know,

10    you're not -- you have no intention to amend your complaint at  11:21:13

11    this time?

12          MS. PALLER:  That's correct.

13          THE COURT:  So that's -- you have to rely on the rule

14    A lot of times people come in and they say, well, we know we

15    agree.  We're going to amend the complaint and the other side  11:21:26

16    agrees to it and I just put a date certain in there so we all

17    know.

18          I'm going to put sort of an N/A, not applicable, in

19    this case because there's no intent.  If there's a rule change,

20    then you can apply -- I mean, if there's something that comes   11:21:42

21    up in discovery, then you can apply to the Court to amend your

22    complaint because some of these become something that could

23    have been discovered eons ago.  I'm talking about the generic

24    cases now, not this one, and that invokes another analysis

25    under the rules so we can go from there.                        11:22:03

United States District Court

2:22-cv-01242-SMM, January 17, 2024

```
 1              All right.  And then we ought to put a paragraph in          11:22:05
 2  here then about the -- or should I just leave it to you about
 3  this common disclosures, discoveries, things that you're going
 4  to do without necessarily further request such as --
 5              MS. PALLER:  Yes.  I'm sorry.  Go ahead.                      11:22:26
 6              THE COURT:  No.  Go ahead.
 7              MS. PALLER:  So it's in here currently the parties
 8  agree that the end of fact discovery would be January 31 of
 9  2025.  We had initially -- and this actually will go to the
10  expert discovery piece but we had initially suggested that all          11:22:39
11  fact discovery should close by the end of July.  And the
12  Government expressed some concern with that time frame and
13  asked instead of seven months, let's kick that out 12 months
14  but we would have some interim deadlines and so there are two.
15  One is to produce common discovery by July 31 of 2024 although          11:22:55
16  I believe Mr. Tinsley said that might be producible by the end
17  of February.  If we would like to kick that up, happy to hear
18  it.
19              The second interim deadline is substantial completion
20  of production of documents by September 1, 2024, so that we can         11:23:09
21  really keep things moving even if there's a little bit of
22  trickle in by the end of the year.
23              THE COURT:  Okay.
24              Mr. Tinsley, what are your thoughts?  Do you want to
25  vary that at all or not?                                                11:23:29
```

United States District Court

2:22-cv-01242-SMM, January 17, 2024

```
 1          MR. TINSLEY:  I really have nothing more to say on          11:23:30
 2   that point.  I do believe we can get the common discovery
 3   sooner than July 31 but I'm glad to keep that as the ultimate
 4   deadline which is not telegraphing that I'm going to wait until
 5   that ultimate deadline.  I think my goal would be to get it      11:23:47
 6   sooner than later.
 7          THE COURT:  It's July of this year; is that correct?
 8          MR. TINSLEY:  Correct, sir.
 9          THE COURT:  Well, July 31 is a Wednesday so we bump
10   that over to August 2?                                           11:24:00
11          MR. TINSLEY:  Sure.
12          MS. PALLER:  Your Honor, could we bump it up to the
13   earlier Friday instead of back into August?
14          THE COURT:  What's the difference in one week?
15          MS. PALLER:  It's just that everything so far has         11:24:16
16   gotten pushed back and we really don't think that this case is
17   so complex that we need to be pushing things back.
18          THE COURT:  Here's my point and think about this.  I
19   know you want to push this.  But if somebody comes back to me
20   later on and says, "Well, Judge, we really need more time," I'm  11:24:29
21   not so sympathetic at that point because I gave you plenty
22   enough time.  I also build in an extra week.  So if a comet
23   hits the United States, that one week is not going to make one
24   whiff's worth of difference.  But also knowing that the
25   Government records are involved and you're relying on other      11:24:51
```

United States District Court

2:22-cv-01242-SMM, January 17, 2024

```
 1  people.  They have vacations.  They have got problems in their     11:24:54
 2  lives.  You may want to take a vacation with -- somewhere or
 3  you're going to book a cruise, your parents are, you know,
 4  going on a 50th reunion, whatever it is, I try and build some
 5  of that in.  This is not the only case that you have.  It's an   11:25:09
 6  important case but it's not the only one that everybody has so
 7  that's why I try and build in just ever so slightly one extra
 8  week here or there, so your request is denied.  I'm going to go
 9  with August 2.
10          And then that's the common discovery.  And then we       11:25:31
11  have the other one of --
12          MS. PALLER:  So September 1, 2024, is the date that
13  we had proposed for substantial completion of document
14  production with a close of fact discovery of January 31, 2025.
15  Those are to account for if there are different folks who need  11:25:53
16  to weigh in whereas common discovery is already packaged up.
17          MR. TINSLEY:  Turns out September 1 is a Sunday.
18          THE COURT:  Yes.  We don't want to do that.  And then
19  the rest of that week I believe is Labor Day in there
20  somewhere.                                                      11:26:09
21          MR. TINSLEY:  That is correct.
22          THE COURT:  So we either bump it back into August or
23  just keep it and move it to the sixth, September 6 because a
24  lot of people at the end of the summer are on vacation and that
25  includes Labor Day weekend and things like that.  I'm trying to 11:26:22
```

2:22-cv-01242-SMM, January 17, 2024

1   be a humane person here.  Otherwise, if I really want to put          11:26:26

2   the hammer down, I'm not -- you know, you'll feel yourself

3   working around the clock.  I don't want to do that to you all.

4   As much as you would like to, I don't want to do that to you.

5          MS. PALLER:  And I defer to you, Your Honor, as to            11:26:42

6   how that falls.  I would hope for my team to be done with the

7   deadline before a holiday weekend instead of having one the

8   week after but I think we can kind of all work together.

9          THE COURT:  And I think -- nothing is sacrosanct

10  about getting it in earlier.  It's I don't want to push it back    11:26:58

11  later.  I do know that, for instance, since you are from

12  Washington, so nice in Washington in the month of August,

13  there's no humidity there.  It's perfect whether.  It's a

14  little warmer out here and a lot of people like to escape out

15  here.  And even though Mr. Tinsley probably is relying on all     11:27:17

16  of these agencies -- so September 6 it is and then your

17  completion of discovery, the ultimate fact discovery, is --

18  that date, one more time?

19          MS. PALLER:  The date that we had proposed was

20  January 31, 2025.                                                   11:27:45

21          THE COURT:  And that would actually be January 31,

22  yes.

23          MR. TINSLEY:  Friday.

24          THE COURT:  Okay.  Then -- now, are we looking at a

25  lot of interrogatories in this case?  Are you relying on          11:28:06

1   disclosures and that sort of thing?  Because the rule says you       11:28:09

2   get 20 interrogatories and 20 interrogatories probably per

3   person but they may overlap.  Are we relying on anything you

4   need excessive interrogatories for, either side?

5        MS. PALLER:  We don't currently anticipate needing          11:28:26

6   excessive interrogatories.  If that comes up as discovery

7   proceeds, we'll be in touch but I don't foresee that.

8        MR. TINSLEY:  With personal injury cases, which is

9   usually what I try and litigate, I do have a set of

10   interrogatories that I've adapted from Arizona's uniform          11:28:45

11   interrogatories.  They probably consist of maybe 25 and that's

12   just background information.  I'm not sure if I will be using

13   that for this matter.

14        THE COURT:  You'll get 20.  I'm not going to give you

15   an extra five.  I'm going to give you the 20 and that includes     11:29:07

16   subparts.  But the reason is so much of this should be consumed

17   by your common discovery and your common disclosures and things

18   like that, which is what the rules anticipate, and I would

19   encourage you that when -- for instance, hypothetically, you're

20   going to disclose medical records of some -- of the minors who     11:29:25

21   were treated if they had medical treatments or this or that,

22   that some attestation is the wordiness of those records so that

23   we don't have to go back and say, as Mr. Tinsley might say, did

24   you have medical records and are they and where are they and

25   who are they with and that sort of thing.  We're trying -- I'm     11:29:49

2:22-cv-01242-SMM, January 17, 2024

```
 1   trying to make this easier on all of you, but I'm a great fan     11:29:53
 2   of initial disclosures and how they are done so just keep that
 3   in mind.
 4          MS. PALLER:  Your Honor, one quick thing that comes
 5   to mind is just that there are minors involved or at least the    11:30:07
 6   youngest plaintiff was six at the time of separation so I think
 7   he's about 13 now.  And there might be a point in time down the
 8   road where additional interrogatories make more sense than a
 9   deposition of that young child.  So I just wanted to put that
10   out there so we're thinking of it.                                11:30:22
11          And I don't know if Mr. Tinsley knows how that has
12   played out in other cases.  I haven't been following along with
13   that level of granularity.
14          THE COURT:  Do you know if at all what?
15          MR. TINSLEY:  Do I know if at all what?                    11:30:35
16          THE COURT:  How that was handled, younger children
17   that now have grown up?
18          MR. TINSLEY:  I don't know offhand how that has been
19   handled in other matters.  I can check.
20          THE COURT:  You all work it out and you come back and      11:30:50
21   see me if it's necessary to make some adjustments.  I'm always
22   available to try and help you out in light of unusual
23   circumstances.
24          MR. TINSLEY:  I can also tell you I typically don't
25   care to take minors' depositions when they are alleging injury.   11:31:04
```

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1   I believe it's onerous in many cases.  I don't know that it's                    11:31:10

2   harassment but it can be onerous on a child and I can't -- I

3   can't recall the last time I have done that if I have ever done

4   that.

5          THE COURT:  Well, that's up to you but that's your                        11:31:25

6   style.  Other times I have witnessed where children come in

7   here to testify and they have no understanding of what the oath

8   means.  If they lie, they have no understanding.  And they get

9   precluded as a witness.  They have to have at least that

10  understanding.                                                                   11:31:47

11         Anyway, but the point being, admissions would be 20

12  also but some of these things are covered by the files of

13  so-and-so.  I mean, in the old days people would say, Nick,

14  that's your name.  That's ridiculous, things like that.

15  Although they can be a phony person.  I've had people deny that  11:32:08

16  it's their signature somewhere and that caused another issue of

17  sending it out for analysis which is fun.  It really did change

18  the complexity when the report came in.

19         MR. TINSLEY:  Before you came out here, we were just

20  talking about how I've used my name, Larry, Larry Green, Larry   11:32:30

21  G, Laurence, Laurence Green, over time.  So it happens.  But I

22  can't imagine sending a Request for Admission as to names.

23         THE COURT:  Well, no.  No, but I mean it does happen

24  where it's important.  Is that your signature on that line?  Is

25  that your name?                                                                  11:32:50

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1        And we know out here I get a lot of aka's on illegal      11:32:52

2   reentry after deportation.  They have a whole litany of other

3   names and there could be legitimate reasons for that.

4        There are also some not-so-good reasons.  They have

5   had a lot of fracases in other states, including our own,      11:33:11

6   trying to mask that.  And I have had some very interesting

7   testimony where people have said, "It's not me, it's not me,"

8   and they have all of these fingerprint files on record and the

9   agent comes in and testifies they just fingerprinted that

10  person that morning and they are all the same so that it links   11:33:31

11  all of that stuff together.

12       I'm not anticipating we're going to have that problem

13  in this case.  Let's put it that way but just so we keep the

14  rules -- and because all of you are in this case now.  Six

15  months from now, what happens if somebody comes in who has no    11:33:46

16  familiarity with this case and they know what their obligations

17  are if they are going to take over this case and that's the

18  reason we do this, so that we can protect everybody there and

19  we know what their obligations are.

20       Okay.  Now let's talk about your friends, the             11:34:06

21  experts.  And you want to do -- we're now talking about

22  disclosures or anyone who has the burden of proof on a

23  disclosure issue like an affirmative defense.  He will be bound

24  by that also.  If it's relying on expert opinion for some

25  reason.  When I say "him," Mr. Tinsley.                        11:34:31

United States District Court

2:22-cv-01242-SMM, January 17, 2024

 1          MR. TINSLEY:  If you want, I can speak to this issue.          11:34:40
 2   This seems to be the only disagreement that we have.

 3          THE COURT:  Well, go ahead.  It's a month's
 4   difference on disclosure.

 5          MR. TINSLEY:  And that month difference does make a          11:34:52
 6   difference to our side.

 7          THE COURT:  How's that?

 8          MR. TINSLEY:  The irony is they have alleged this is
 9   a significant case involving the highest level of Government
10   and it is a very significant, important case and yet they want          11:35:04
11   to provide us a discovery schedule that is more akin to a mild
12   car accident, red car, blue car case.  But and that's what the
13   schedule read like and I'm not objecting to that with one
14   exception and that is, we have claims that are primarily
15   emotional damage claims in this case.  These are psychological          11:35:29
16   claims that plaintiffs claim to be permanent in nature.  They
17   also claim some physical injury as well.

18          So I don't know yet the number of experts who will
19   need to conduct examinations pursuant to Rule 35, commonly
20   known as IMEs, although I am refraining from using the term          11:35:51
21   these days.  But there's potentially at least eight experts who
22   would do Rule 35 exams and we don't know yet because we don't
23   know what the prior discovery on damages is going to reveal to
24   us during depositions.

25          So I need that time built in so that I can first          11:36:14

United States District Court

1  interface -- identify and interface with those experts, for          11:36:17

2  them to conduct with IMEs where needed -- there I go again,

3  Rule 35 examinations where needed and for them to write their

4  reports and to be evaluated not only by me but other members of

5  the DOJ who is involved in this case as well as several          11:36:38

6  agencies who all have their own counsel.

7          So there's a lot of moving parts in this case.  And I

8  think I have been quite reasonable in terms of the red car blue

9  car sort of discovery schedule that was proposed and that we

10  are agreeable to.  But I think eight weeks really makes a          11:36:58

11  difference to us in terms of from the time that fact discovery

12  is closed to the time that we do the disclosures of experts.

13          So that is my rationale for asking for eight weeks

14  from that point in time.

15          THE COURT:  Let me hear your side of the coin.          11:37:25

16          MS. PALLER:  Yes.  So there are two related issues

17  here and I alluded to one earlier which was the extension of

18  the fact discovery period that we had originally proposed.  So

19  our view is we can get this all done in seven months.  A bulk

20  of it has already been done through common discovery which          11:37:38

21  would look very different if it was a couple of years ago and

22  we were the first case proceeding through discovery.  So that

23  is kind of a new thing for us that we can all benefit from that

24  will be more efficient and take less time.

25          So let's do this in seven months to close the fact          11:37:52

2:22-cv-01242-SMM, January 17, 2024

1    discovery, then we'll have I believe it's six weeks for                    11:37:55

2    plaintiffs' disclosures of experts, four weeks for defendant's,

3    everything tees off of that.

4           And where we got to with that is the Government said

5    for all of these reasons, it's actually not quite as clean.               11:38:05

6    There are lots of layers of folks that they will have to speak

7    so let's push discovery out until just over 12 months from now

8    instead of seven.  When we agreed to that, we were hoping to

9    then maintain those time periods between the flowing events

10   that follow when it comes to all of our expert disclosures,               11:38:20

11   plaintiffs, defendants and then the rebuttal experts.  And in

12   my view, you know, the Government can actually get started on

13   some of the expert work as soon as they are ready.  They might

14   have even retained some of these experts or worked with them in

15   other cases.                                                              11:38:36

16          So when we think about that four-week window versus

17   the eight week-window, not only do we think four weeks is

18   sufficient when teed off of plaintiffs' disclosures.  But it's

19   really, in my mind now, 12 months plus six weeks plus four

20   weeks because we've extended the close of fact discovery and             11:38:48

21   everything is teed off of those windows.  So here it actually

22   looks a bit more complicated than it is.

23          The only dispute was around that one time frame

24   whereas the parties agreed on all of those other windows.

25          THE COURT:  Okay.                                                  11:39:02

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1   Mr. Tinsley, do you have to be somewhere today?  You 11:39:05

2 keep looking at the clock.

3     MR. TINSLEY:  I am just keeping track of time, Judge.

4     THE COURT:  Well, I am, too.

5     MR. TINSLEY:  I'm not -- well, I understand.  Anyway, 11:39:13

6 I don't have a watch so I apologize if I am distracting the

7 Court by looking at the clock behind me.

8     If I may just respond to what we just heard.

9     THE COURT:  Go ahead.

10    MR. TINSLEY:  And that is it's interesting earlier 11:39:32

11 the Court talked about building in extra time for the parties,

12 especially when we're talking about the magnitude of the case,

13 vacations, the number of people involved, the number of

14 agencies involved, the number of witnesses involved.

15    It's interesting you use that term because in my 11:39:55

16 papers, in my argument that I was going to mention to you my

17 view that the Court should indeed, quote, build in a good

18 amount of time for us to make sure that we have fully

19 discovered what we need to in terms of damages.

20    Sure we have a lot of common discovery issues that 11:40:16

21 we're agreeable on but that's liability.  I don't know who

22 these plaintiffs have.  I haven't met them, I haven't talked to

23 them yet.

24    I have some of their record.  I don't know how they

25 are going to present, what they are going to say at deposition. 11:40:31

2:22-cv-01242-SMM, January 17, 2024

1    I need additional time for ensuring that I have fully            11:40:35

2    discovered the damages case.  So that's why I suggested that

3    eight-week period from the time of plaintiffs' expert

4    disclosures until ours.  So from March 14 to May 9.  It doesn't

5    seem like a real exorbitant amount of time especially when      11:40:57

6    we're talking maybe a two-week difference.  It makes a big

7    difference to me.  I have a lot of moving parts to deal with.

8    I have a lot of agencies.  I have a lot of witnesses and I have

9    a lot of discovery to complete on damages.  So I believe it's

10   reasonable for us to have that built-in time, especially when   11:41:21

11   we're talking eight separate plaintiffs.  Maybe the schedule

12   would work if I said red car blue/car case or maybe one single

13   family of which there are many such cases that are cited here.

14        If you look at the discovery schedule in those cases,

15   you'll see that they are talking similar time frames for single 11:41:44

16   families.  Here we're talking four families with eight

17   plaintiffs, so I think a proportional amount of time would be

18   reasonable and equitable.

19        THE COURT:  Okay.  I've heard all of you and I agree,

20   from a sequencing point of view, to build in a little more time 11:42:06

21   as you have suggested, Mr. Tinsley.  And after listening to

22   counsel on the other side, they are going to try and get it

23   done sooner and you can always disclose sooner; but ordinarily,

24   having seen experts more than I care to, there's always a

25   problem with the experts.  It's not so much counsel.  It's      11:42:29

2:22-cv-01242-SMM, January 17, 2024

| | |
|---|---|
| 1 | their time, the expert's time, and I'm not available for this | 11:42:33 |
| 2 | and I'm not available for that and they don't understand that |
| 3 | if you lay a subpoena on them, it's not their choice, it's your |
| 4 | choice when they are going to be available to have their |
| 5 | deposition taken. | 11:42:44 |
| 6 | The point being it is important and we don't know how |
| 7 | much of these people we're going to need so I think -- so your |
| 8 | first deadline for initial disclosure for anyone having the |
| 9 | burden of proof, I have two deadlines here. One was March 14 |
| 10 | and the other one is either April 11 or May 9. Which one is | 11:43:00 |
| 11 | it? There's too many dates there. |
| 12 | MR. TINSLEY: I am proposing May 9. |
| 13 | THE COURT: All right. I'm going to give you that. |
| 14 | MR. TINSLEY: All right. The March 14 is an |
| 15 | agreed-upon deadline so it's the deadlines that are following | 11:43:14 |
| 16 | that starting at May 9 that are at issue. |
| 17 | THE COURT: Okay. So defendant's experts are May 9 |
| 18 | but the original one for the plaintiffs are still the March 14; |
| 19 | correct? |
| 20 | MR. TINSLEY: Correct. | 11:43:35 |
| 21 | THE COURT: Of 2025; right? |
| 22 | MS. PALLER: Correct, Your Honor. |
| 23 | THE COURT: Darn, I was hoping we can get the Ides of |
| 24 | March in there but we're one day off. |
| 25 | And then rebuttal would be -- | 11:44:02 |

United States District Court

2:22-cv-01242-SMM, January 17, 2024

```
 1        MS. PALLER:  So, Your Honor, I believe we can now      11:44:07
 2   move to defendant's proposals if we're going with the
 3   eight-week period between plaintiffs' expert disclosures and
 4   defendant's expert disclosures the parties were in agreement on
 5   the time frames between events from here on out.               11:44:19
 6        THE COURT:  I've got one between May 9 and the other
 7   one is on June 6 on rebuttals.  You agree to those times if
 8   they are true rebuttal?
 9        MS. PALLER:  So our May 9 proposal stemmed from there
10   being only a four-week window between our expert disclosures    11:44:38
11   and theirs; but the parties when we met and conferred, talked
12   about the time period between the disclosures so sounds to me
13   like Your Honor had just moved to the eight-week window for
14   defendants to disclose their experts and we had been in
15   agreement I believe it was four weeks then to get to rebuttal   11:44:53
16   expert disclosures so that would be June 6, 2025.
17        THE COURT:  Very historic date.
18        MS. PALLER:  And then similarly with completion of
19   expert depositions, the parties were in agreement that there
20   would be a window of about eight weeks between rebuttal expert  11:45:12
21   disclosures and completion of expert depositions which would be
22   August 1, 2025.
23        THE COURT:  Okay.
24        Agreed?
25        MR. TINSLEY:  Yes.                                         11:45:32
```

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1       THE COURT:  Okay.  All right.  Now a couple of things    11:45:33

2  with regard to experts.  Give your expert a copy of the rule on

3  what their disclosures must look like.  Anything short of that

4  you may end up having to do it all over again, which is very

5  expensive.  And I see too many cases where the experts want to    11:45:51

6  say I'm an expert.  I'm so smart, accept what I'm going to tell

7  you why you win and the other side loses.  It's because I'm the

8  expert.  Now I'm shorthanding that.  Experts are very

9  important.  But they are very -- a little bit cavalier with

10 regard to their reports.  So if it's not in alignment with Rule    11:46:11

11 26, you're going to do it all over again and that is your

12 problem, not mine.

13       Also, nothing can be raised in rebuttal, a true

14 rebuttal report.  There's something new that was never raised

15 in your original or in the answer.  Somebody raises something    11:46:39

16 entirely new, it will not be admissible at trial and so just

17 keep that in mind.  So people who want to -- I always say if

18 you have an expert, they should be proud of their opinion and

19 what they did and what they accomplished or if they think they

20 are going to lay in the weeds and sandbag, that's not the time    11:46:59

21 to do that.  It wastes too much time.  So tell them to do it

22 the right way and get it done the right way and we won't have

23 any problems.

24       And then when we go to trial, we will have them when

25 one witness gets off the witness stand, another one gets on the    11:47:15

United States District Court

2:22-cv-01242-SMM, January 17, 2024

 1   witness stand.  We don't say we'll try from -- at their                     11:47:19

 2   convenience.  We won't do that but we're talking about a trial

 3   way down the road so I'm not worried about that.

 4          Now, what about length of -- you've already indicated

 5   I should say the number of depositions.  You have the parties              11:47:41

 6   themselves, that's about three or four per family, somewhere in

 7   that neck of the woods, the parents -- between two and three or

 8   four people.  And you're entitled under the rules of 10

 9   depositions per side.  What are you going to do about that?

10          MR. TINSLEY:  I have a proposal.                                    11:48:11

11          THE COURT:  Go ahead.

12          MR. TINSLEY:  I believe -- we can be flexible, as

13   I've said already.  A lot of these depositions have already

14   been taken.  A lot of this has already been discovered on a

15   policy-level basis.                                                        11:48:24

16          With regard to individual plaintiffs of which there

17   are eight, there are four families, there are four agencies

18   essentially involved.  We've got DHS, DHHS, ORR, and CPB --

19   CBP, four agencies.  I would propose that we do four of those

20   depositions per family for a total of 16.  I don't mind               11:48:51

21   agreeing to that.  We would of course want 16 on our side as

22   well but I can't imagine I would go take 16 depositions.

23          But I believe we can be flexible on that and agree to

24   that.

25          MS. PALLER:  So, Your Honor, it's a little bit tricky       11:49:14

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1  for me to predict because just earlier today Mr. Tinsley          11:49:16

2  explained something that I was not aware of previously which is

3  that the common discovery includes some deposition transcripts

4  that might be used in this case.

5       And if we receive a fair amount of that and it covers      11:49:29

6  our bases, then I don't know if we even need four per entity,

7  per family.

8       If that turns out to be somewhat irrelevant to the

9  circumstances of my clients, I would not have wanted to say

10 here that four is sufficient or that we can use the common      11:49:43

11 discovery in place of the depositions.  So at first blush, I

12 believe if I'm understanding you correctly, four per agency per

13 family might work; but I really am struggling to predict what

14 the common discovery looks like and how we might be more

15 efficient or need something a bit further than that.            11:50:01

16      THE COURT:  Just tell me at the outset, what is your

17 best guess on how many you need because some people want to

18 have discovery of the Western universe, you know.  That's not

19 going to happen.  And I do have to limit this and that's what

20 I'm asking.                                                     11:50:16

21      MR. TINSLEY:  Let me be real clear.  I'm not saying

22 four per agency.  I'm saying four per plaintiff families so a

23 total of 16, four per family of four agencies.

24      THE COURT:  How about if I give you 20 each and you

25 can then parse them out among the families if you see fit.  If  11:50:38

United States District Court

1    you don't need them, that's fine.  If somebody comes in and        11:50:42
2    says, oops, excuse me I need seven more depositions, what
3    happens between the day we were all in the courtroom and now
4    that you need more depositions because that runs the costs up
5    so the question is, trying to get an idea to put the building      11:50:56
6    blocks in place so that when you go back to your clients and
7    the other people in your firms and everything, I believe that's
8    important.

9           MS. PALLER:  I believe 20 per side sounds like a
10   great starting point.  I think looking ahead, we probably would   11:51:10
11   want to reserve the right to take a deposition of one person at
12   any facility that the children were at and potentially where
13   the parents were detained as well.

14          I would love to have fewer depositions rather than
15   more if we can avoid it.  We'll see some of that in what is       11:51:25
16   produced not only in common discovery but specific to these
17   plaintiffs.

18          I know for one of the minors there was actually a
19   discrepancy where for a few days the Government wasn't able to
20   provide documentation about where that child had been and so it   11:51:38
21   might be that one kid was in one spot for the two months that
22   they were separated and we only need one deposition or maybe
23   there are extenuating circumstances where we would need a
24   couple.  But I just wanted to put those facts out there because
25   I believe it will really tie to the facts as we consider          11:51:54

2:22-cv-01242-SMM, January 17, 2024

1  depositions.                                                                    11:51:57

2          THE COURT:  I'll give you 20.  If it's a problem, let

3  me know.

4          Now, in Arizona in our state courts he we have

5  limitations of time on four hours per deposition absent         11:52:05

6  experts.  Experts, parties get seven hours under the Rule but

7  anybody else -- or a 30(b)(6) and there are no 30(b)(6)

8  witnesses in this case.  So the question is, I hold to that

9  rule absent extenuating circumstances.  You can ask an awful

10  lot of questions in four hours and it will help to you focus if  11:52:32

11  they present their testimony here in trial.

12          Are you going to need more than that or not?

13          MS. PALLER:  I believe the parties had agreed on

14  seven hours each.

15          Am I remembering that, Mr. Tinsley?                      11:52:48

16          MR. TINSLEY:  Yes, I believe that's the presumption

17  in Federal District Court.

18          THE COURT:  That's what the rule is and the

19  presumption is there but you know as well as I do, you know

20  that I limit them to four.  So why do you need seven hours?     11:53:00

21          MR. TINSLEY:  I can tell you at this point in time.

22  I believe it's fact-specific and case by case.

23          You're right I have practiced before this Court

24  several times.  I haven't seen that as a major circumstance in

25  any of my cases before you.                                     11:53:23

United States District Court

 1      THE COURT:  Well, that's because I've limited you to          11:53:25
 2   four so, I mean, now you're saying what about seven.  I mean, I
 3   have trouble saying for someone that has been here, you're
 4   covering a 60-day period of time, you would need seven hours to
 5   talk to that individual about what happened and even in stress    11:53:40
 6   and all of the other things that go with it, I'm having a
 7   little bit of trouble and I assume, though -- let me caveat --
 8   you may have a languish in depositions where you have to have
 9   an interpreter.  That could be a problem.

10      MS. PALLER:  Yeah.  There are a couple of points              11:54:02
11   there.  So I do think that some of the plaintiffs would benefit
12   from an interpreter and it would create a cleaner record to
13   have a Spanish to English interpreter.  I think this actually
14   goes back to one of your questions earlier in the day which is
15   about why are we trying all four families together and that is   11:54:16
16   actually another reason why seven hours is probably safer.

17      Now, I'm confident that we and Mr. Tinsley will work
18   to shorten that time period.  If we can do it in three hours,
19   let's do it three, not six or seven; but I do think that there
20   are some real efficiencies to be gleaned trying those families   11:54:35
21   together as a single case.  But if there is, for example, a
22   single representative from one of these agencies that can speak
23   to the circumstances of all eight of the plaintiffs or four of
24   them, that we should do that in seven hours instead of breaking
25   that up into various different depositions or cases.             11:54:52

2:22-cv-01242-SMM, January 17, 2024

1        THE COURT:  Okay.  I'll give you seven and I'll rely                11:54:56

2  on you to try and keep it shorter than that because that's

3  another bill that runs up the cost of case.

4        But that being said, I do all of my own discovery

5  disputes myself if there are any.  I don't farm them out.  I do      11:55:12

6  them and you call me and we'll talk about it over the phone.

7  If I want additional briefing that you think is important, I

8  may give you that accommodation.  Otherwise a lot of times

9  something happens in the middle of the deposition unbeknownst

10  to counsel, witness is uncooperative or whatever happens and so    11:55:31

11  I have to intercede there.  But I'll take care of those but

12  please do that.

13        Also, this brings me to another point.  I've got

14  lawyers.  I've got lead counsel on both sides and I've got

15  other people who are denominated therein who are lawyers also.    11:55:53

16  If they are going to help try the case, that's fine.

17        But if there's going to be a problem or if there's

18  something to be signed, it should be signed by lead counsel --

19  that's you, ma'am, and you, Mr. Tinsley, over here -- and that

20  is it.  I don't want to have -- and I understand how firms work    11:56:12

21  and you've parsed some of this work out and say oh, we've got a

22  firm over in Colorado and we want to take a deposition over

23  there and then all of a sudden that person is talking to

24  somebody else and somebody else over here and over there and

25  pretty soon I've got a Ping-Pong discussion going on.  I don't    11:56:28

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1   like those.  So I deal with only the lead counsel on anything       11:56:32

2   related to the signature or a dispute that is going on that

3   needs to be resolved.

4           And I don't mean to cut out your associates over

5   there or if they are lead counsel in a case, some of the            11:56:50

6   parties involved, they are entitled to do that.  They can do

7   their own.

8           But I don't like where you run through the firm of

9   different people involved or the Department of Justice with a

10  bunch of people involved.  Same thing.                              11:57:04

11          Now I see we've come to one of our favorite things

12  here.  We have a position on your dispositive motions, if any.

13  I can't imagine what those would look like but they could be

14  very interesting and discrete.  I do give you more than one.

15  Many of my colleagues do not.  If there's a discrete, narrow       11:57:36

16  issue that really does turn the case and there are no facts in

17  dispute over these things, I do give you a right to seek to

18  file a motion but you won't get extra page limits for it so

19  those type of things -- I'll give you something silly.  What

20  was the weather condition on such-and-such a date?  And if         11:58:05

21  there's no dispute on that but that becomes important to

22  something, somebody can file a motion for summary judgment on

23  that -- the weather that day or whatever it is.

24          But I can't imagine this kind of case that you're

25  going to have motions for summary judgment.  These are disputes    11:58:21

United States District Court

1    of fact it seems to me, maybe not.                              11:58:26

2            What are your thoughts?

3            MS. PALLER:  I think there probably will be motions

4    for summary judgment.  I appreciate the context on the

5    possibility to file multiple if they are discrete.             11:58:36

6            THE COURT:  Yes.  But other than that, if you are

7    going to give me something that looks like the Washington DC

8    telephone directory six times over, that's a different matter.

9            MS. PALLER:  Understood, Your Honor, so I think it's,

10   again, a bit hard to predict until we've been through          11:58:50

11   discovery.  But I imagine there will be some topics that we can

12   likely have vetted out in a motion for summary judgment.

13           THE COURT:  Mr. Tinsley?

14           MR. TINSLEY:  I don't disagree.  You have ruled on a

15   motion to dismiss.  Some of those issues may crop up again.    11:59:06

16           THE COURT:  I would imagine if they would, because

17   that was just a motion to dismiss statement, I would imagine

18   they might crop up a little bit later on.

19           MR. TINSLEY:  Yes.  So there may be motion practice

20   on some of the issues once discovery has been had.             11:59:28

21           THE COURT:  Keep in mind I'm very reluctant to give

22   you more pages and how many people do you have working on this

23   case in your firm.

24           MS. PALLER:  There are -- there's a partner, you've

25   referred to my colleague, Justin Bernick and then they're four 11:59:41

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1   associates and the context there is two of us had babies in the        11:59:44
2   last two years.
3           THE COURT:  No.  No.  Now you didn't want to give him
4   time off for something like that for vacations and stuff.  Of
5   course I would give you time off for that.                           11:59:55
6           MS. PALLER:  Well, no.  The context is -- and
7   Mr. Tinsley knows this and he now has my cell phone but I
8   stepped in when one of my colleagues had a baby, shortly after,
9   either one.  But we all work closely together and we are in the
10  DC office together but my local counsel here is Lewis Roca.          12:00:12
11          THE COURT:  And they are right down the street.  I'm
12  very sensitive.  I took a case from Sacramento for California
13  Eastern District and I had two outstanding women lawyers
14  involved and they both had children right after each other plus
15  something else intervened there, some other issues or -- I           12:00:34
16  can't even remember; but at the end as we were getting pretty
17  close, they settled the case as I thought they might.  But they
18  were almost embarrassed.  I said we always give time for that.
19  That's important.  This is a once in a very -- generations this
20  works out.  More power to you.                                       12:00:58
21          MS. PALLER:  Well, Your Honor, and as I told Mr.
22  Tinsley, I'm very done having kids.  My husband will be happy
23  to have that on the written record.  We're not going anywhere.
24  The team is what it is now.
25          THE COURT:  And that happens like when they are in          12:01:13

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1    school, things go haywire and you have to cancel a trip?  You          12:01:14

2    might have to do all sorts of thing.  I try and be very

3    understanding about family issues.  That's important.

4           MS. PALLER:  Thank you, Your Honor.

5           THE COURT:  See what's a date for motion for summary          12:01:27

6    judgment?  I need a date.

7           MR. TINSLEY:  I believe that we proposed -- we had

8    competing proposals.  I believe I said a time after discovery

9    was complete and I'm looking for that right now.

10           THE COURT:  That depends, too, would they be          12:01:51

11    expert-dependent or not?

12           MR. TINSLEY:  It's hard to say at this point.

13           THE COURT:  I know that but that's one of the issues.

14           MR. TINSLEY:  I would imagine it would be

15    expert-dependent and I'm looking at our schedule that was          12:02:01

16    proposed.  I suggested two months after the completion of all

17    expert depositions, if we are putting a date on that which I

18    believe is August 1 so it would be October, mid-October maybe.

19           MS. PALLER:  And, Your Honor, we had proposed to be

20    determined date following the completion of fact discovery for          12:02:29

21    the reason you just put your finger on, to see how much this is

22    expert dependent or not once we've gotten through fact

23    discovery.  If we're setting a date, I don't oppose two months

24    from the close of expert can depositions.

25           THE COURT:  So that would be mid-October of 2025.          12:02:45

United States District Court

2:22-cv-01242-SMM, January 17, 2024

 1          MS. PALLER:  I believe early October.                    12:02:48

 2          MR. TINSLEY:  I said two months but today I said

 3   mid-October.

 4          THE COURT:  Okay.  Then October 17 would be a good

 5   date?                                                           12:02:55

 6          MS. PALLER:  Of 2025, Your Honor.

 7          THE COURT:  Yes.  Because if you have a motion for

 8   summary judgment that is not fact-dependent upon an expert, you

 9   can bring it sooner.  It's just a matter of law.  But if

10   it's -- and think about this.  If it's expert-dependent, does  12:03:14

11   that presumptively create a question of fact for the Court to

12   decide in the course of a trial on their expert testimony and

13   whether they are believable or not?

14          MS. PALLER:  Might depend on the topic, Your Honor.

15          THE COURT:  That's why you have this flexible           12:03:37

16   accordion time frame.

17          Okay.  And when we get done with all of this, we

18   would all get back together and pick out a trial date.  If it's

19   going to take two weeks to try the case, I can give you two

20   weeks.  If it's going to take two months, I can give you two   12:04:02

21   months.  That's the luxury of being a senior Judge, because we

22   are very busy around here.  Our numbers always top the charts

23   in the top ten districts in the country for weighted cases and

24   volume.

25          So we can do that but we'll figure that out and         12:04:23

United States District Court

2:22-cv-01242-SMM, January 17, 2024

1    that's where schedules become important, because we don't take          12:04:29

2    breaks.

3          What are your thoughts on -- do you think -- you

4    don't know what it would be for a trial time now.

5          MS. PALLER:  Phoenix is beautiful and I would not          12:04:43

6    mind spending two months here, but I don't think that case is

7    going to take a few months.  I think it's a matter of days.

8          THE COURT:  That's fine.  Just to let you know, I

9    don't give you a trial date now because then that puts an

10   artificial a deadline in there because there's too many moving          12:05:00

11   parts can that can go haywire at any given time.

12         Now, the other thing is what other thing -- oh,

13   settlement.  You can, you can settle your case yourselves,

14   which is traditional among lawyers.  You want to hire someone

15   who is an outside mediator, be my guest.  You're not going to          12:05:24

16   bother me with that.  It's not my case.  It's your case.

17         On the other hand, if you want a magistrate judge,

18   that takes a little bit more orchestrations because their time

19   is extremely busy and they are all very competent at what they

20   do.  They are just very good at settling case.  If you want to          12:05:41

21   use one of them, we'll work that out for you.  Just have to let

22   me know when it is but I will not stop the movement of the case

23   while you take time out to settle it.  That comes on your time,

24   not my time.

25         What else do you want to take up?          12:06:01

2:22-cv-01242-SMM, January 17, 2024

1        MS. PALLER:  Nothing else for me, Your Honor.                12:06:03

2        MR. TINSLEY:  I think we've covered it thoroughly.

3        THE COURT:  Okay.

4        All right then.  You know, if we try the case, it

5   might be are June, July in Arizona would be a good two months    12:06:15

6   to do that.

7        I see you're colleagues over here smiling.

8        MS. PALLER:  They are laughing because they know I'm

9   from Minneapolis and I'm not used to hot weather.

10       MR. TINSLEY:  I'm actually thinking August is ideal          12:06:32

11  and optimal.

12       THE COURT:  Right.  Okay.  But, no, we want to try

13  and orchestrate these things so it's sort of a businesslike

14  procedure so you can go back to your clients and everything

15  like that.  And we do -- I don't know how -- I'm sure in DC and  12:06:49

16  other places around the country they are used to working with

17  witnesses and people who have language barriers.  We use

18  interpreters all the time here and so many different dialects.

19       Now, because this is a civil case, it's up to the

20  parties to arrange for their own interpreters.                   12:07:12

21       Our interpreter office here for our criminal cases

22  has a bank of expert interpreters and they can help you find

23  people if you have the unusual dialect or something like that

24  or, say, do you know if 15 different experts in these different

25  dialects, can you help us out, they can do that.  They can help  12:07:39

| | | |
|---|---|---|
| 1 | you but they can't be your interpreter but they can help you | 12:07:43 |
| 2 | find someone and that's not always the easiest thing to do.  We | |
| 3 | have some people who come here who have unique dialects or | |
| 4 | they're in a part of the world where they are in a warring | |
| 5 | faction with maybe somebody else involved and they don't trust | 12:08:02 |
| 6 | the interpreter from the other side.  We've had that occur | |
| 7 | April case, so you have to kind of move those things around. | |
| 8 | That takes a little bit of time to do.  Please keep that in | |
| 9 | mind but they are more than willing to help you out in locating | |
| 10 | someone if you immediate them. | 12:08:19 |
| 11 | MS. PALLER:  Thank you.  That's helpful to know. | |
| 12 | THE COURT:  And then are most of these people -- I | |
| 13 | know you know where they are but are they now located sort of | |
| 14 | outside of Arizona in some fashion or are they here? | |
| 15 | MS. PALLER:  They are not here but we would make sure | 12:08:34 |
| 16 | they are present as needed. | |
| 17 | THE COURT:  Okay.  Because that may -- if you start | |
| 18 | taking their depositions because the case is here, does it make | |
| 19 | sense to -- if they are in Columbus, Ohio, does it make sense | |
| 20 | that everybody goes over there as opposed to having the | 12:08:52 |
| 21 | families come back over here for deposition.  I don't know but | |
| 22 | try and work those things out. | |
| 23 | MR. TINSLEY:  I believe that's a detail we can work | |
| 24 | out.  I've been agreeable to do out of state depositions | |
| 25 | through WebEx or Zoom and we might be able to do that.  What | 12:09:06 |

United States District Court

2:22-cv-01242-SMM, January 17, 2024

| | | |
|---|---|---|
| 1 | complicates it is the language issue. | 12:09:12 |
| 2 | THE COURT:  Yes. | |
| 3 | MR. TINSLEY:  That might make it more challenging to | |
| 4 | do through Zoom or WebEx. | |
| 5 | THE COURT:  If you can work that out, that's fine. | 12:09:23 |
| 6 | MR. TINSLEY:  They are not here today. | |
| 7 | THE COURT:  I excused all parties from being present | |
| 8 | here because that's just another expense. | |
| 9 | MR. TINSLEY:  Yeah.  There was a motion for them to | |
| 10 | appear telephonically. | 12:09:37 |
| 11 | THE COURT:  Yeah.  And I decided rather than go | |
| 12 | through all of that and have all of that on the phone back and | |
| 13 | forth and sometimes they have question, what does this mean and | |
| 14 | what does that mean and talking about these preliminary | |
| 15 | matters, that gets to be a much more extended conversation and | 12:09:48 |
| 16 | we want to make sure they are fully informed when we talk about | |
| 17 | these things. | |
| 18 | For instance, they might talk about some procedure. | |
| 19 | What are you talking about?  And you get these foreign | |
| 20 | languages -- I'll give you an example.  Someone waives their | 12:10:11 |
| 21 | right to have their case presented to a grand jury.  In Mexico | |
| 22 | there is no grand jury.  That's a concept that is completely | |
| 23 | foreign to them.  So you have to explain it's 23 citizens who | |
| 24 | are called in here to do this, to do this, to do that and then | |
| 25 | you need 13 people to agree to bring charges.  That's a very | 12:10:31 |

1   lengthy conversation.  And do you understand that?  Not really.   12:10:35

2   Could you do that one more time?  And we do it one more time or

3   two more times, whatever it takes.  But it's a concept that is

4   not unique to their background and training and understanding

5   and education.   12:10:51

6          And you get someone who comes here from a foreign

7   country.  They may be, you know, a second grade education in

8   their country and yet now all of a sudden you transpose them

9   into our legal systems which is very complex and you as the

10  attorneys have a tough time explaining that to them and that's   12:11:07

11  understandable.  But that's -- you undertook those obligations

12  and you seek to represent them but it's not easy.

13         And I think that Mr. Tinsley points at a good thing

14  and that is foreign languages can be very difficult and we have

15  another problem down here because so many of the things that   12:11:25

16  occur are things where slang language is employed as it relates

17  to some of these parties and you have to make sure that they

18  under what the slang means because oftentimes it changes --

19  it's idiomatic expressions, it changes the meaning of the

20  conversation.   12:11:49

21         And often witnesses will say, "I don't know what you

22  mean by that," and we have to rephrase the question, all of

23  that takes time and that's what it's all about.

24         So unless there's anything, we'll turn you loose.

25  Thank you for coming down and being here.  Thanks for walking   12:12:05

United States District Court

2:22-cv-01242-SMM, January 17, 2024

```
 1    down the street or taking the light rail or doing something to      12:12:07
 2    get over here.  I appreciate it.  Maybe on the way back down
 3    the road, you -- the rest of you could settle the case right
 4    now, but I don't think that's going to happen.
 5              MR. TINSLEY:  We'll see.                                   12:12:20
 6              MS. PALLER:  Thank you, Your Honor.
 7              THE COURT:  Okay.  Thanks -- and you -- well, all of
 8    us keep track of the other cases that are going on in this
 9    district.  There may some other districts.  And it may give us
10    some insight about where we're heading in this.  And if there's     12:12:33
11    anything that I can help you out with, please feel free to
12    call.  Don't get upset with each other.  Call me and say,
13    "We're having trouble here.  Do you have any ideas on how we
14    can overcome this little bump in the road?"
15              But I appreciate it.  Thank you, all very much.           12:12:49
16    We'll stand at recess.  Go ahead.  I've got some other things
17    to take care of.  Thank you.
18              MR. TINSLEY:  Thanks again.
19              (Whereupon, these proceedings recessed at 12:12 p.m.)
20                          *  *  *  *  *                                  12:12:59
21
22
23
24
25
```

United States District Court

```
 1              C E R T I F I C A T E                          12:12:59

 2

 3         I, ELAINE M. CROPPER, do hereby certify that I am

 4  duly appointed and qualified to act as Official Court Reporter

 5  for the United States District Court for the District of       12:12:59

 6  Arizona.

 7

 8         I FURTHER CERTIFY that the foregoing pages constitute

 9  a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled     12:12:59

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15         DATED at Phoenix, Arizona, this 27th day of January,    12:12:59

16  2024.

17

18

19

20                           s/Elaine M. Cropper                    12:12:59

21                           _____

22                           Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  12:12:59


                      United States District Court
```